IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEAF INVENERGY COMPANY, a Cayman Islands exempt limited liability company, | § § § § | No. 308, 2018 |
| Plaintiff Below-Appellant/ Cross-Appellee, | § § § § | Court Below—Court of Chancery of the State of Delaware |
| v. | § § § | |
| INVENERGY RENEWABLES LLC, a Delaware limited liability company, | § § § § | C.A. No. 11830-VCL |
| Defendant Below-Appellee/ Cross-Appellant. | § § § | |

Submitted: February 13, 2019
Decided: May 2, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Bradley D. Sorrels, Shannon E. German, Andrew D. Berni, WILSON SONSINI GOODRICH & ROSATI, P.C., Wilmington, Delaware; Keith E. Eggleton, Steven D. Guggenheim (*argued*), David A. McCarthy; WILSON SONSINI GOODRICH & ROSATI, P.C., Palo Alto, California; *Attorneys for Appellant/Cross-Appellee Leaf Invenergy Company*.

Kenneth J. Nachbar (*argued*), Kevin M. Coen, Zi-Xiang Shen, Coleen W. Hill, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Bruce S. Sperling, Harvey J. Barnett, Eamon P. Kelly, SPERLING & SLATER, P.C., Chicago, Illinois; *Attorneys for Appellee/Cross-Appellant Invenergy Renewables LLC*.

**TRAYNOR**, Justice:

In 2008, Invenergy Wind LLC ("Invenergy"), a wind energy developer, was raising money for a Series B investment round, and Leaf Clean Energy Company ("Leaf Parent"), an investment fund, expressed interest. After extensive negotiations, Leaf Parent invested $30 million in Invenergy Series B notes through a vehicle called Leaf Invenergy Company ("Leaf"). The agreement governing the Series B notes ("Series B Note Agreement") gave noteholders such as Leaf the right to convert to equity and incorporated an LLC agreement ("Series B LLCA") that the noteholders and Invenergy would execute upon conversion.

The Series B Note Agreement and the Series B LLCA also included provisions that prohibited Invenergy from conducting a "Material Partial Sale"—a defined term—without Leaf's consent unless Invenergy paid Leaf a premium called a "Target Multiple"—another defined term. Although the parties renegotiated several aspects of their agreements with one another over the next few years, the consent provisions persisted in substantially similar form into the Third Amended and Restated LLC Agreement (the "LLC Agreement"), which is the operative agreement in this dispute. Those consent provisions form the crux of this litigation.

Leaf filed suit after Invenergy closed a $1.8 billion asset sale—a transaction that Invenergy concedes was a Material Partial Sale—without first obtaining Leaf's consent or redeeming Leaf's interest for the Target Multiple. After a trial, the Court

2

of Chancery concluded that, although Invenergy had breached the Material Partial Sale consent provisions, Leaf was not entitled to the Target Multiple. The court then awarded only nominal damages because, according to the court, Invenergy had engaged in an "efficient breach."[1] The Court of Chancery directed the parties to complete a buyout of Leaf's interests pursuant to another LLC Agreement provision that Invenergy had invoked after Leaf had filed suit.

We disagree with the Court of Chancery's interpretation of the consent provision and its award of nominal damages and therefore REVERSE. The consent provisions unambiguously require Invenergy to pay Leaf the Target Multiple if it conducts a Material Partial Sale without Leaf's consent, and the concept of efficient breach does not permit Invenergy to circumvent that requirement. Because Invenergy conducted a Material Partial Sale without Leaf's consent and without paying Leaf the Target Multiple, Leaf is entitled to the Target Multiple as contractual damages. We thus award Leaf the Target Multiple in damages on condition that it surrenders its membership interests in Invenergy.

---

[1] *Leaf Invenergy Co. v. Invenergy Wind LLC* ("Opinion Below" hereafter), 2018 WL 1882746 (Del. Ch. Apr. 19, 2018).

# I. BACKGROUND[2]

Founded in 2001, Invenergy is a developer and operator of wind energy facilities in North America and Europe. Leaf Parent is a publicly traded investment fund specializing in renewable energy and sustainable technologies.

## A. 2008: Leaf invests in Invenergy's Series B notes

In the summer of 2008, Invenergy sought to raise additional capital by issuing convertible debt. Several investors expressed interest including Leaf Parent and Liberty Mutual Insurance Company ("Liberty Mutual"), the latter of which had invested in Invenergy during Invenergy's earlier Series A funding round. Ultimately, Leaf invested $30 million in Invenergy Series B convertible notes in two closings in December 2008 and February 2009.[3]

The Series B Note Agreement enumerated several items that required the consent of the noteholders. Among other things, Invenergy could not conduct a "Material Partial Sale"[4] without majority noteholder consent[5] unless the noteholders received the Target Multiple at the closing of such a sale. The Target Multiple, in

---

[2] The Court of Chancery's opinion provides a more detailed treatment of the factual background; we have included the most significant and relevant facts here.

[3] Bank of America Strategic Investments Corporation also invested $20 million in the Series B round, but those notes were purchased by an investment vehicle controlled by Invenergy's CEO in December 2012.

[4] The term "Material Partial Sale" is a contractually defined term, but it suffices to say here that it refers to a sale of a significant portion of Invenergy's assets.

[5] The contractual definition of how this majority is determined in various cases is somewhat complex, App. to Opening Br. A132 ("A__" hereafter), but those complexities are not of consequence here.

4

turn, was defined as multiples of the noteholders' initial investment that grew over time. Essentially, Invenergy could conduct a large asset sale with or without the noteholders' consent. But in exchange for the right to conduct a sale without the noteholders' consent, the noteholders were afforded the ability to cash out with a handsome agreed-upon return on their investment upon Invenergy's exercise of that right.

The Series B notes matured on December 22, 2014, but Series B noteholders could convert their Series B notes into equity before the conversion deadline, which was initially set for December 22, 2011. As a practical matter, if Invenergy did poorly, the Series B noteholders would stay in the notes and preserve their debt covenant rights. On the other hand, if Invenergy did well, the Series B noteholders would convert into equity and capture an upside on their investment.

To facilitate a conversion, the Series B Note Agreement incorporated an LLC agreement ("the Series B LLCA") that would come into effect upon conversion. The Series B LLCA gave the converted noteholder-members many rights similar to what they had as Series B noteholders. For example, like the Series B Note Agreement, the Series B LLCA provided that Invenergy could not conduct a "Material Partial

Sale"[6] without the consent of members unaffiliated with management or redeeming[7] unaffiliated members for the Target Multiple. As the Court of Chancery found, Leaf and Invenergy had contemporaneous understandings that these and similar clauses guaranteed that the investors would receive the Target Multiple if Invenergy engaged in Material Partial Sale without the investors' consent.

The Series B LLCA also included reciprocal call and put rights that Invenergy and the converted noteholders could exercise between December 22, 2013 and December 22, 2014. Under Section 11.09 of the Series B LLCA, converted noteholders could "require that [Invenergy] purchase all but not less than all" of its interest.[8] The same section provided that Invenergy could "redeem all but not less than all" of the converted noteholders' interests.[9] These rights collectively ensured that the Series B investors would either exit or renegotiate their investment by December 22, 2014.

## B. 2011–13: Invenergy and its investors make minor changes, but Leaf preserves its Material Partial Sale consent right

In 2011, Invenergy sought to extend the maturity date of the Series B notes by two years to facilitate other refinancing transactions. The Series B noteholders,

---

[6] The term "Material Partial Sale" is defined differently in the Series B LLCA than in the Series B Note Agreement, but again it suffices to say that it also means a sale of a significant portion of Invenergy's assets.

[7] The parties agree that payment of the Target Multiple redeems Leaf's interests. *See* Opening Br. 27–28; *see also* Answering Br. 51.

[8] A192 (JX 38 at 59).

[9] *Id.*

including Leaf, agreed to Invenergy's modifications and received matching extensions of two years on the conversion deadline and the put and call windows. During this process, the parties also agreed to slight modifications to the calculation of the Target Multiple.

In the summer of 2013, Liberty Mutual and Invenergy explored having Liberty Mutual convert its Series A and Series B notes into equity, but Invenergy was concerned that Leaf, as the primary remaining Series B noteholder, would then possess outsize power to block transactions. For its part, Leaf wished to facilitate the conversion because it believed that it would benefit Invenergy and consequently benefit Leaf as an investor. Therefore, Leaf agreed to amendments to the Series B Note Agreement that limited some of its former rights, but preserved its right to consent to Material Partial Sales and change-of-control transactions. With the amendments made, Liberty Mutual converted $12.5 million of its Series A notes and all of its Series B notes into equity.

### C. 2014: Leaf explores liquidation and the parties affirm that Leaf would receive the Target Multiple if Invenergy conducts a Material Partial Sale without Leaf's consent

In 2014, Leaf Parent began an orderly liquidation of all of its assets to return funds to investors, and it began to explore exit options for its Invenergy investment. After reviewing the relevant documents, Leaf Parent concluded that the Series B

LLCA provided for a higher Target Multiple than the Series B Note Agreement.[10] Fortuitously for Leaf Parent, Invenergy was also exploring recapitalization options around the same time. One of the options Invenergy was exploring would have two of Invenergy's existing investors increase their equity stakes and required Leaf's consent.

Leaf eventually consented to the recapitalization though not before negotiating some small modifications to the Series B Note Agreement and the Series B LLCA, which contains the central operative language in this case. Section 8.04 now stated:

> Without the prior written consent of . . . [Leaf],[11] [Invenergy] shall not:
>
> . . .
>
> (b) participate in or permit a Material Partial Sale, unless the transaction giving rise to the Material Partial Sale yields cash proceeds equal to or greater than the amount that would provide [Leaf], as of the closing of such Material Partial Sale, with cash proceeds equal to or more than their applicable Target Multiple with such Target Multiple to be paid upon such closing of the Material Partial Sale.[12]

---

[10] As the Court of Chancery found, Leaf Parent understood that the Series B LLCA, as amended, provided for a guaranteed IRR of 23% while the Series B Note Agreement, as amended, provided for a guaranteed IRR of only 20.5%.

[11] The agreement reads "the Required Series B Non-Voting Investor Members" in place of "Leaf." No party disputes that Leaf is the "Required Series B Non-Voting Investor Member" of concern.

[12] A420.

As the Court of Chancery found, all parties had contemporaneous understandings that this clause would require Invenergy to pay the Target Multiple to Leaf if Invenergy chose to conduct a Material Partial Sale without Leaf's consent.

With Section 8.04 freshly reaffirmed, Leaf had a number of choices, including selling its Series B notes to a third party, having Invenergy repurchase the notes, and converting to equity and exercising the put right in the Series B LLCA. Leaf's exploration of those choices apparently annoyed Invenergy, but were not directly of consequence.

### D. 2014–2015: Invenergy conducts a Material Partial Sale and admits Leaf as a member

In late 2014, Invenergy learned that wind assets were being highly valued by potential buyers and concluded that the timing was right for an asset sale. For what appears to be a mix of financial and non-financial reasons, Invenergy did not wish to have to obtain Leaf's consent or pay it the Target Multiple.

One of the interested buyers was TerraForm Power, Inc. ("TerraForm"). Leaf soon discovered that Invenergy was considering an asset sale to TerraForm and began planning to take advantage of that asset sale. Among other things, Leaf's executives believed that Leaf would be most likely to receive the Target Multiple if

Leaf converted to equity after a deal was "fully baked" but before that deal actually closed.[13]

The TerraForm deal moved along quickly. On June 4, 2015, TerraForm offered to purchase a number of Invenergy wind projects for an aggregate price of $2.4 billion. On June 6, Invenergy and TerraForm entered into an exclusive negotiation period.

Meanwhile, Invenergy tried to keep Leaf in the dark. On June 16, Invenergy held a regularly scheduled noteholder meeting that Leaf attended. No one mentioned the TerraForm deal. Leaf's board, growing suspicious, voted on June 18 to convert its notes and sent notice to Invenergy that same day. The Series B Note Agreement required Invenergy to convert within three days. Invenergy, however, did not complete the conversion within three days. Instead, it decided to seek regulatory approval for the conversion.

On July 1, Invenergy and TerraForm executed a purchase agreement in which TerraForm would buy a number of Invenergy's assets for $1.2 billion in cash and the assumption of $800 million in debt. Invenergy would use the majority of the cash to pay investors, retaining only $107 million for working capital. According to Invenergy, the deal represented a sale of 12.5% of its assets, implying a firm value of approximately $16 billion. On July 6, Invenergy publicly announced the deal.

---

[13] App. to Answering Br. B156 (JX 223).

Although Invenergy rushed to finalize the TerraForm deal, it dragged its feet when it came to completing Leaf's conversion from debt to equity. It was not until July 10 that Invenergy filed for regulatory approval, which it received on September 23. On September 24, Invenergy's equity holders admitted Leaf as a member of Invenergy. Finally, on December 15, 2015, Invenergy and TerraForm entered into an amended and restated purchase agreement and closed the deal the next day without having ever received Leaf's consent or paying Leaf the Target Multiple. The final $1.8 billion deal left Invenergy with $85 million in working capital.

**E. The litigation in the Court of Chancery**

Things did not settle down after the TerraForm deal closed, and Leaf filed this suit on December 21, 2015. One week later, Invenergy exercised its call right, proposing a price of $42.4 million for Leaf's 2.3% stake, implying a firm value of just $1.8 billion. In turn, Leaf exercised its put right the same day and proposed a price of $214 million for its stake. The LLC Agreement provided for a dispute resolution process that would eventually result in a valuation of $50.7 million.

While the put-call dispute resolution was ongoing, Leaf moved for partial judgment on the pleadings, arguing that Invenergy breached the LLC Agreement by closing the TerraForm transaction without Leaf's consent and without paying Leaf its Target Multiple. For its part, Invenergy claimed that the proper time to determine Leaf's membership status was at the time of signing, not closing and that Leaf was

11

not a member when it signed the initial TerraForm transaction agreement. And once the put-call dispute resolution process was complete, Invenergy also challenged a portion of that process—an appraisal conducted by XMS Capital Partners, LLC—as improperly influenced by Leaf.

In what the Court of Chancery and this opinion calls the Liability Order, the Court of Chancery granted Leaf's motion, finding that Invenergy breached Section 8.04 of the LLC Agreement by not obtaining Leaf's consent or paying the Target Multiple.[14] It held that the operative time for determining Leaf's status as a member was at closing. It further determined that, even if the operative time was at signing and not at closing, then Leaf had still become an equity holder before signing because TerraForm and Invenergy had executed an amended deal agreement just before closing. The Court of Chancery, however, reserved judgment on damages.

Shortly after the Court of Chancery entered the Liability Order, Leaf moved for the entry of an order and final judgment in its favor in the amount of the Target Multiple, which Leaf had determined was $126,110,576. At this point, Invenergy modified its argument to also claim that, despite the breach, Leaf was not entitled to

---

[14] Order Granting Pl's Mot. for Partial J. on the Pleadings ("Liability Order" hereafter) ¶ 12, *Leaf Invenergy Co. v. Invenergy Wind LLC*, No. 11830 (Del. Ch. June 30, 2016) Dkt. No. 39 ("Because [Invenergy] did not follow either the Consent Path or the Payout Path, it breached the plain language of [Section 8.04].").

damages because the TerraForm transaction had not harmed Leaf.[15]  Although the Court of Chancery found that Leaf correctly calculated the Target Multiple, it denied Leaf's motion and held a trial on damages.[16]

In its post-trial decision, the Court of Chancery agreed with Invenergy and held that Leaf had failed to prove actual damages despite overwhelming evidence that "until midway through this case, all of the parties to the LLC Agreement understood that Leaf would receive its Target Multiple if Invenergy engaged in a Material Partial Sale without Leaf's consent."[17]  The Court of Chancery then awarded Leaf one dollar in nominal damages and ordered the parties to complete the put-call sale process.

---

[15] *See* Invenergy's Answering Br. to Leaf's Mot. for Entry of an Order and Final J. 21, *Leaf Invenergy Co. v. Invenergy Wind LLC*, No. 11830 (Del. Ch. Aug. 12, 2016) Dkt. No. 62.

[16] The Court also rejected Invenergy's argument that, because Leaf did not seek injunctive relief before the closing of the TerraForm transaction, Leaf was precluded from recovering damages. In a passage that presaged the dispute now before us, the Court of Chancery wrote:

> [Invenergy] was free to proceed with the TerraForm Transaction as long as [Invenergy] paid Leaf its Target Multiple. [Invenergy] could also choose to engage in the transaction if it regarded the payment of damages as a form of efficient breach. *See E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 445–46 (Del. 1996). Leaf clearly communicated to [Invenergy] that it believed the TerraForm Transaction required its consent and that if the deal closed, then Leaf would be entitled to its Target Multiple. [Invenergy] chose to proceed [without Leaf's consent]. Under the circumstances, Leaf was not required to seek pre-closing relief. Rather, it was [Invenergy] that assumed the risk of a post-closing remedy.

Order Denying Mot. for Entry of an Order and Final J. ("Order Denying Final Judgment") ¶ 13, *Leaf Invenergy Co. v. Invenergy Wind LLC*, No. 11830 (Del. Ch. Oct. 10, 2016) Dkt. No. 81.

[17] *Opinion Below, supra* note 1, at *26.

How did the court transform Leaf's expectation—shared by Invenergy—that, based upon the bargained-for consent and payment rights in Section 8.04, it would receive $126 million under the circumstances that occurred here into a single dollar? A brief summary of the Court of Chancery's analysis should suffice to set the stage for our review.

The Court of Chancery's damages discussion recognized the well-settled rule[18] that damages for breach of contract are based on the non-breaching party's— here Leaf's—expectation interest. As the Court of Chancery correctly noted, "expectation" is a term of art.[19] When determining expectation damages, courts determine an amount that will give the injured party "the benefit of its bargain by putting that party in the position it would have been but for the breach."[20] The primary element of expectation damages is the "the value that the performance would have had to the injured party," or the "loss in value" caused by the deficient performance compared to what had been expected.[21]

And on this point, the Court of Chancery laid out the extensive evidence showing beyond any shadow of a doubt that Leaf and Invenergy both harbored the belief—one that persisted until after the court entered its Liability Order—that Leaf

---

[18] Restatement (Second) of Contracts § 347 (1981).
[19] *Opinion Below, supra* note 1, at *30.
[20] *Genecor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000) (quoted by *Opinion Below, supra* note 1, at *30).
[21] Restatement (Second) of Contracts § 347 cmt. b (1981).

was entitled to payment of the Target Multiple if Invenergy engaged in Material Partial Sale without Leaf's consent, as it did here. The Court of Chancery, however, without citing any specific authority, disregarded the parties' subjective expectations apparently finding that they were not sufficiently reasonable to form the basis of a damages award. Instead, the court relied on a pair of its earlier opinions that addressed consent-right provisions in other contexts and the principle of efficient breach in support of its conclusion that Leaf could not recover damages unless it demonstrated "actual damages by showing that it suffered harm as a result of the TerraForm Transaction or that it would have secured additional consideration given the opportunity to negotiate for its consent."[22] The court found that Leaf could show neither—hence, the nominal damages award.

Leaf now appeals to this Court, arguing that (1) the Court of Chancery misinterpreted the LLC Agreement when it made its damages determination; (2) Section 8.04 of the LLC Agreement unambiguously gave it a payment right; (3) even if Section 8.04 was ambiguous, the Court of Chancery erred by not adopting Leaf's reasonable interpretation; and (4) the Court of Chancery misapplied the law regarding contractual damages. In turn, Invenergy contests each of Leaf's contentions on appeal and cross-appeals the Court of Chancery's denial of its motion to strike the XMS appraisal.

---

[22] *Opinion Below, supra* note 1, at *31.

15

## II. STANDARD AND SCOPE OF REVIEW

We review questions of contract interpretation and questions of law *de novo*.[23]

## III. ANALYSIS

The parties agree that the controlling contract is the Third Amended and Restated LLC Agreement, which this opinion calls the "LLC Agreement" for short. The parties—and the Court of Chancery—also agree that Invenergy breached Section 8.04 of the LLC Agreement by conducting a Material Partial Sale without Leaf's consent.

### A. Principles of contract interpretation

Because the Court of Chancery's award of only nominal damages instead of the Target Multiple hinged upon its interpretation of Section 8.04, our analysis starts there. When we interpret contracts, our task is to fulfill the "parties' shared expectations at the time they contracted."[24] "[B]ut because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party."[25] Accordingly, we "interpret clear and unambiguous terms according to their ordinary meaning. Contract terms themselves will be controlling when they establish the parties' common meaning so

---

[23] *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009).
[24] *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017).
[25] *Id*. (internal quotations omitted).

that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[26]

## B. Interpretation of Section 8.04

Both sides contend that Section 8.04 unambiguously supports their respective positions. As mentioned above, Section 8.04 states that:

> Without the prior written consent of . . . [Leaf], [Invenergy] shall not:
>
> . . .
>
> (b) participate in or permit a Material Partial Sale, unless the transaction giving rise to the Material Partial Sale yields cash proceeds equal to or greater than the amount that would provide [Leaf], as of the closing of such Material Partial Sale, with cash proceeds equal to or more than their applicable Target Multiple with such Target Multiple to be paid upon such closing of the Material Partial Sale.[27]

### i. The parties' and the Court of Chancery's interpretations

Leaf argues that Section 8.04 is an express and unambiguous agreement that, "[i]f Invenergy wanted to proceed with a Material Partial Sale and Leaf did not consent, Invenergy had to buy Leaf out."[28] The Court of Chancery found—and, indeed the evidence conclusively showed—that Invenergy read Section 8.04 in the same way deep into this litigation.

But Invenergy pivoted after the Court of Chancery entered its Liability Order in which the Court found that Invenergy had breached Section 8.04 by closing the

---

[26] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).
[27] A420.
[28] Opening Br. 30.

17

TerraForm transaction without having secured Leaf's consent or paying the Target Multiple. According to Invenergy's belatedly gained understanding of "the plain structure"[29] of Section 8.04, payment of the Target Multiple in the absence of Leaf's consent was not a contractual obligation but merely an "exception" to Invenergy's need to obtain Leaf's consent. Although neither Invenergy nor the Court of Chancery offer a particularly satisfying explanation of how this exception to the consent right—a right that apparently vanishes upon Invenergy's election to ignore it—operates, we understand their understanding to work like this:

> If Invenergy chooses to engage in a Material Partial Sale:
>
> It may do so by securing Leaf's consent. If it does not wish to or cannot secure Leaf's consent, it may—but is not required to— invoke the payment "exception" by delivering the Target Multiple to Leaf at closing.
>
> OR
>
> It may do so by ignoring Leaf's consent right and without invoking the payment exception. (This option is also characterized as a "bypass" to the consent right.) If this is Invenergy's choice, Leaf's remedy will only account for Invenergy's failure to obtain Leaf's consent and not Invenergy's failure to pay the Target Multiple.

Under the latter scenario, which is what occurred here, Invenergy contends that the only contractual obligation breached is the obligation to secure Leaf's consent because Section 8.04 imposes no obligation on Invenergy to pay the Target Multiple

---

[29] Answering Br. 31.

upon conducting a Material Partial Sale. In Invenergy's view, the payment provision is Invenergy's way around Leaf's consent right and does not entitle Leaf to payment when Invenergy ignores that right altogether.

In its damages analysis, the Court of Chancery adopted Invenergy's interpretation:

> [T]he evidentiary record developed at trial showed that the parties believed subjectively that there were only two possibilities under the Series B Consent Right: Either Leaf would consent, or Leaf would not consent and receive its Target Multiple. Their expectation regarding Leaf's receipt of its Target Multiple stemmed from the *exception* to the Series B Consent Right and the misimpression that it created a right to receive the Target Multiple in the event of breach . . . . Properly understood, the *exception* was only an *exception*.[30]

Accordingly, despite its determination in the Liability Order that the plain language of Section 8.04 *obligated* Invenergy to follow one of two paths (secure Leaf's consent or pay the Target Multiple) if it engaged in a Material Partial Sale, the Court of Chancery used this "exception theory" to support the clearing of a new path that imposed no obligation on Invenergy to pay the Target Multiple and consequently awarded only nominal damages in this suit.

*ii. Our analysis*

Our reading of Section 8.04 leads us to conclude that Section 8.04 unambiguously requires Invenergy to pay Leaf the Target Multiple if it conducts a

---

[30] *Opinion Below, supra* note 1, at *31 (emphasis added).

19

Material Partial Sale without Leaf's consent. As Section 8.04 is written, it is logically equivalent to a clause that provides that, if Invenergy conducted a Material Partial Sale without Leaf's consent, then Invenergy must pay Leaf the Target Multiple. And such a clause warrants an award of damages in the amount of the Target Multiple in the event of a nonconsensual Material Partial Sale without payment. This plain and logical reading is consistent with the parties' shared understanding of Section 8.04 until Invenergy saw a new light after the Court of Chancery's pre-trial breach ruling.

The Court of Chancery appears to have originally adopted the view we are expressing when it concluded in its Liability Order that "[t]o engage in a Material Partial Sale in compliance with the plain language of [Section 8.04, Invenergy] was *obligated* to follow one of two paths"[31]—secure Leaf's consent or redeem its interest for the Target Multiple.[32] But the Court of Chancery erred when it—contrary to the plain meaning of Section 8.04—adopted Invenergy's "exception" theory and then decided that the doctrine of efficient breach (more about that later) allowed Invenergy to neither obtain consent nor pay Leaf the Target Multiple.

---

[31] *Liability Order, supra* note 14, at ¶ 9.
[32] *See infra* note 41 and accompanying text.

### iii. *Ford Holdings/GoodCents Holdings*

To support its interpretation that Section 8.04 does not give Leaf a right to the Target Multiple when Invenergy conducts a Material Partial Sale without Leaf's consent, the Court of Chancery cited two previous Court of Chancery opinions: *In re Appraisal of Ford Holdings, Inc. Preferred Stock*[33] and *In re Appraisal of GoodCents Holdings, Inc.*[34] In our view, neither of these opinions justify the Court of Chancery's departure from the plain meaning of Section 8.04, as mutually understood by the parties at the time of contracting and thereafter.

In *Ford Holdings*, the Court of Chancery interpreted the rights of two groups of preferred shareholders in a cash-out merger under the following clause:

> Without the affirmative vote of the holders of a majority of the [preferred] shares . . . , [the company] may not . . . merge with or into any other corporation unless . . . each holder of [preferred] shares . . . shall receive, upon such . . . merger, an amount in cash equal to the liquid [*sic*] preference, Merger Premium, if any, and accumulated and unpaid dividends.[35]

Chancellor Allen concluded that this clause—which, like Section 8.04, conditions a transaction upon shareholder consent—did not waive the shareholders' statutory appraisal rights under 8 *Del. C.* § 262.

---

[33] 698 A.2d 973 (Del. Ch. 1997).
[34] 2017 WL 2463665 (Del. Ch. June 7, 2017).
[35] *Ford Holdings*, 698 A.2d at 978–79.

We agree with that conclusion. The preferred shareholders were entitled to either (1) a vote on the merger or (2) a certain amount of cash proceeds. The company decided to bypass the shareholder vote by offering shareholders the cash proceeds. We agree that the clause in question and the company's decision to offer a liquidation preference in lieu of a vote in accordance with the shareholder agreement had no apparent impact on the shareholders' statutory appraisal rights.

We do not see, however, how *Ford Holdings*—where there was no breach of contract and where the final holding related to appraisal rights—can be read to support a decision that a party injured by a contractual breach cannot recover a contractually specified premium. By choosing one of two contractually permissible options, the company in *Ford Holdings* did not breach its contract with the preferred shareholders. In this case, Leaf and Invenergy agreed at the time of contracting that there would be two contractually permissible alternative paths to a Material Partial Sale: either Invenergy would secure Leaf's consent or Invenergy would pay the Target Multiple. Invenergy took neither road, however, and that has made all the difference.

In the 2017 *GoodCents* case, the Court of Chancery examined a provision similar to Section 8.04 but in a different context. In *GoodCents*, the preferred shareholders of GoodCents Holdings controlled over 80% of the voting power of the corporation. In 2015, in what was seemingly a surprise to the common

22

shareholders,[36] GoodCents was sold for less than the liquidation preference of the preferred shares. Under GoodCents' certificate of incorporation, the preferred shareholders ordinarily could not receive a larger per-share payout than the common shareholders on an as-converted basis. There were a few exceptions, however, and the Court of Chancery was asked to interpret the following clause:

> Without the affirmative vote of the holders of a majority of the . . . Preferred Stock, the corporation shall not . . . effect any merger or consolidation . . . unless the agreement or plan of merger . . . shall provide that the consideration payable to the stockholders of the corporation . . . shall be distributed to the holders of capital stock of the corporation in accordance with [the preference clauses, which gave preferred shareholders additional rights over common shareholders].

According to the preferred shareholders, they were entitled to senior claims equal to the liquidation preference on the merger consideration because they had not waived the preference clauses.[37] But because the merger consideration was less than the amount of the liquidation preference, this would have left the common shareholders with nothing. The Court of Chancery disagreed with the preferred shareholders' interpretation. Relying upon *Ford Holdings*, it held instead that the voting clause "grants the Preferred Stockholders the right to a class vote but not a right to the Liquidation Preference in the case of a merger."[38] Consequently, Court

---

[36] *See GoodCents*, 2017 WL 2463665, at \*2, Pet'r Opening Br. in Support of Mot. for Partial Summ. J. 4, *GoodCents*, No. 11723 (Del. Ch. Jan. 19, 2017) Dkt. No. 47, Montejo Aff., Exhibit 6 at 2, *GoodCents,* No. 11723 (Del. Ch. Jan. 19, 2017) Dkt. No. 49.

[37] *See* Respondent's Opening Br. in Support of Mot. for Partial Summ. J. 23, *GoodCents*, No. 11723 (Del. Ch. Jan. 19, 2017) Dkt. No. 44.

[38] *GoodCents*, 2017 WL 2463665, at \*6.

of Chancery ordered the merger consideration to be distributed *pro rata* to all common and preferred shareholders.

While we think *GoodCents* reached the right result, we are not persuaded by its logic. As mentioned above, *Ford Holdings* did not pass on whether the shareholders in question had a right to a liquidation premium in the absence of an affirmative vote. Moreover, the preferred shareholders in *GoodCents* held 80% of the voting power and appear to have voted to approve the merger.[39] By the terms of the consent-right clause in question and by virtue of the preferred shareholders' "affirmative vote," the corporation could conduct a merger without making a preferential distribution to the preferred shareholders.[40] Thus, the result—if not the reasoning—in *GoodCents* is supported by the facts in that case. But in this case, Invenergy's failure to obtain Leaf's "affirmative vote," *i.e.*, Leaf's consent, is among the fundamental causes of its breach. To the extent that *GoodCents* turns on an interpretation that the above-quoted provision cannot yield damages in the amount of the liquidation preference even in the absence of consent, we reject it.

---

[39] Montejo Aff., Exhibit 6 at 2, *GoodCents*, No. 11723 (Del. Ch. Jan. 19, 2017) Dkt. No. 49 ("certain stockholders holding less than all of the outstanding shares . . . of GoodCents . . . entitled to vote on such matters acted by written consent pursuant to Section 228(a) of the DGCL to authorize and approve the [attached merger agreement]").

[40] The preferred shareholders' contention that the "affirmative vote" required them to approve not only the merger but a waiver of the preference clauses, *see supra* note 37 and accompanying text, is not a reasonable reading of the contract clause in question. Their selective omissions when paraphrasing the contract clause in their brief substantively changed the meaning of the clause. *Compare* Respondent's Opening Br., *supra* note 37, at 14 *with id.* at 23.

## C. Damages

Because we have concluded that the text of Section 8.04 unambiguously requires Invenergy to pay Leaf the Target Multiple if it conducts a Material Partial Sale without Leaf's consent, and because Invenergy conducted just such a nonconsensual sale, the calculation of Leaf's damages is simple: it is entitled to the Target Multiple.

The Court of Chancery, however, took a different logical tack and came to a different result. As previously mentioned, the Court of Chancery determined in its Liability Order that "[t]o engage in a Material Partial Sale . . . , [Invenergy] was obligated to follow one of two paths."[41] The two paths were: (1) obtain Leaf's written consent before closing or (2) pay Leaf the Target Multiple at closing. It also found that, because Invenergy engaged in a Material Partial Sale without following either path, Invenergy had breached the plain language of Section 8.04. But in its ultimate damages decision, the Court of Chancery concluded that although Invenergy breached Section 8.04, nominal damages of $1 sufficed to put Leaf in as good of a position as it would have been in had Invenergy not breached.

The Court of Chancery reasoned that Invenergy likely would not have agreed to undertake a TerraForm deal structured to pay Leaf the Target Multiple at closing and that the TerraForm deal as it was actually structured did not make Leaf worse

---

[41] *Liability Order*, *supra* note 14, at ¶ 9.

25

off. Rather than examine the issue of damages in terms of whether Invenergy was contractually obligated—as the Court said in its Liability Order—to pay Leaf the Target Multiple, the Court of Chancery approached the issue of damages by focusing on the loss of value to Leaf from Invenergy's participation in a Material Partial Sale without Leaf's consent. In our view, the Court of Chancery's application of that approach—like its interpretation of Section 8.04 in which it adopted Invenergy's "exception theory" to excuse Invenergy from paying the Target Multiple—also missed the mark.

### i. *Expectations and the proper frame of reference*

After finding that Invenergy breached Section 8.04, the Court of Chancery correctly observed that the proper measure of damages should give Leaf the benefit of the bargain it struck with Invenergy and should be based on Leaf's expected position but for Invenergy's breach. But then the Court of Chancery examined the wrong "but-for-the-breach" position—or frame of reference—when conducting that damages analysis.

Before trial, the Court of Chancery correctly observed:

> A more developed record may show that although the Payment Path was drafted as an exception to the requirement to obtain Leaf's consent, and although it was not drafted as a liquidated damages provision, it nevertheless operated to create a clear set of contractual obligations for Leaf. Those expectations envisioned two possible outcomes. One resulted from the Consent Path, where Leaf either would consent to the Material Partial Sale, or the transaction would not happen. The other resulted from the Payment Path, where the Company could proceed

26

with a Material Partial Sale and Leaf would receive its Target Multiple. . . . If Leaf proved [*sic*] that its expectancy was that it would receive its Target Multiple, th[e]n the Target Multiple could provide the proper measure of damages.[42]

Yet despite the Court of Chancery's explicit and numerous findings that Leaf and Invenergy both read Section 8.04 to give Leaf an expectation upon a Material Partial Sale without its consent that it would receive the Target Multiple, the court ignored that expectation. Instead of examining the frame of reference in which Invenergy paid the Target Multiple as both parties expected in a nonconsensual Material Partial Sale, the Court of Chancery decided that a proper analysis of expectancy required—and only required—the construction of a hypothetical negotiation in which Invenergy sought and obtained Leaf's consent[43] and an assessment of whether the TerraForm transaction reduced the value of Leaf's investment in Invenergy.

That analysis failed to consider the entirety of Invenergy's breach. The correct "but-for-the-breach" frame of reference is not what might have happened had Invenergy asked Leaf for its consent because Invenergy's contractual obligations and the means of performing them were not so narrowly drawn. Invenergy's breach was only complete when it failed to obtain Leaf's consent *and* when it failed to pay

---

[42] *Order Denying Final Judgment*, *supra* note 16, at ¶ 11.
[43] Under that hypothetical, it is not unlikely that Leaf would have consented perhaps after seeking to extract some consideration from Invenergy.

the Target Multiple at closing. After all, if Invenergy had structured the TerraForm deal to redeem Leaf for the Target Multiple, there would have been no breach.

Because it is only the combination of the TerraForm deal *plus* the failure to obtain consent *plus* the failure to pay the Target Multiple that constituted the breach, the Court of Chancery should have considered the combination of all of those things when assessing what injury Leaf suffered from Invenergy's breach and thus what amount of damages will return Leaf to the position it would have been in had Invenergy not breached Section 8.04. That objective of returning Leaf to a but-for-the-breach position is not met when Leaf's damages are limited to what it might have obtained through a hypothetical negotiation for consent or the financial impact of the TerraForm transaction on Leaf's investment. Instead, when considering the breach as a whole, what would most aptly repair that breach is Invenergy's payment—now in satisfaction of a damages award—of the amount it agreed it would pay for the right to engage in a Material Partial Sale without Leaf's consent. The Court of Chancery's conclusion to the contrary was erroneous.

Finally, contrary to the Court of Chancery's apparent assertion,[44] remedial provisions and liquidated damages clauses are not the only ways for a contract to

---

[44] *Opinion Below*, *supra* note 1, at *30 ("[T]he parties' subjective beliefs about the likely remedy are not controlling unless memorialized in a remedial provision . . . such as a liquidated damages clause.").

specify the damages flowing from a breach. For example, in a sales contract in which the seller fully performs and the buyer does not pay at all, the seller is entitled to the sales price specified in the contract.[45] Although the sales price might not be under a liquidated damages section or clause, it nonetheless acts as a contractually specified—and controlling—index for damages.[46] Likewise, a liquidated damages clause in this instance would be superfluous given Invenergy's contractual obligation to pay the Target Multiple. Simply put, having agreed that Invenergy would have to pay Leaf the Target Multiple if it engaged in a Material Partial Sale without Leaf's consent, the parties need not have stipulated that the Target Multiple would be recoverable as damages if Invenergy engaged in just such a sale.

ii. *Efficient breach and the Court of Chancery's hypothetical negotiation exercise*

The Court of Chancery invoked the principle of efficient breach to relieve Invenergy from paying the Target Multiple. In particular, having found that Section 8.04 gave Invenergy two options to consummate a Material Partial Sale (securing Leaf's consent or paying it the Target Multiple), the Court of Chancery devised a third option—efficient breach—which it found Invenergy elected, albeit unwittingly. This election, according to the court, leads to "[t]he result . . . that Leaf

---

[45] *See 6 Del. C. § 2-709.*
[46] *Id.*

29

must demonstrate actual damages"[47] outside of the injury it suffered as a result of Invenergy's failure to redeem it for the Target Multiple as contractually mandated. This application of the concept of efficient breach finds no support in our case law.[48]

Efficient breach is a concept that recognizes that "properly calculated expectation damages increase economic efficiency by giving the other party an incentive to break the contract if, but only if, he gains enough from the breach *that he can compensate the injured party for his losses* and still retain some of the benefits from the breach."[49] In other words, efficient breach is based on the idea that a party might find it economically worthwhile to breach a contract because that breach yields economic benefits that exceed the value of the damages it must pay to the non-breaching party.

---

[47] *Opinion Below*, *supra* note 1, at *31.

[48] Neither of the opinions cited by the Court of Chancery in its discussion of efficient breach touches upon the relationship of an efficient breach to the non-breaching party's expectation damages. In *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 446 (Del. 2013), in which we reversed a tortious-interference determination and an award of *punitive*—not compensatory—damages, we merely recognized that the underlying breach was a "so-called 'efficient breach,'" a characterization that was not integral to our decision. And in *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445–46 (Del. 1996), our reference to the "theory of efficient breach" was confined to our discussion of the unavailability of punitive damages for breach of the employment contract in issue. *See also NACCO Indus. v. Applica, Inc.* 997 A.2d 1, 35 (Del. Ch. 2009) (noting that "Delaware also recognizes the concept of efficient breach" and observing that allowing "[a] claim for conspiracy to commit tortious interference against a party to the contract would undercut [the concept and other principles] and preplace the predictability of the parties' agreement with a far less certain, after-the-fact, judicially-fashioned tort remedy." (citing *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020 (Del. Ch. 2006)).

[49] *Bhole*, 67 A.3d at 453 (emphasis added) (quoting *DuPont v. Pressman*, 679 A.2d at 445–46).

The Court of Chancery misapplied the efficient breach concept by reconsidering its damages calculation in response to perceived "efficiency." Courts award contract damages corresponding to the degree of the injury suffered and do not increase or decrease those damages because of "efficiency" or lack thereof.[50] Contrary to the Court of Chancery's application of the principle, efficient breach does not bar recovery[51] or modify damages calculations in any way. Rather, efficient-breach theory recognizes that "a party may find it advantageous to refuse to perform a contract if he will still have a net gain *after he has fully compensated the injured party for the resulting loss*."[52] To use the Court of Chancery's parlance, efficient breach provides two "paths" for a contractual promisor: perform the contract or fully compensate the promisee for non-performance. But efficient breach does not allow the breaching party to bypass the usual method of calculating damages. The Court of Chancery's statement that efficient breach itself results in an alternative method for the determination of damages thus was error.

The Court of Chancery's rejection of the binary options presented by Section 8.04 (secure consent or pay the Target Multiple) in favor of a "third option" ("efficient breach" without payment of the Target Multiple) was followed by a hypothetical negotiation exercise in which Leaf was required to show that it would

---

[50] *See DuPont v. Pressman*, 679 A.2d at 446 (quoting Farnsworth on Contracts § 12.3).
[51] *Supra* note 49.
[52] Restatement (Second) of Contracts, Chapter 16 Introductory Note (1981) (emphasis added).

have secured additional consideration given the opportunity to negotiate for its consent. The Court claimed to find support for this in its prior decision in *Fletcher International, Ltd. v. ION Geophysical Corp.*[53] In that case, the Court of Chancery faced the question of how to calculate damages where the injured party held a consent right that the breaching party had ignored, but there was no contractually provided workaround to the consent right. *Fletcher* then imagined a hypothetical negotiation between the parties for consent to determine the appropriate amount of contractual damages.

But *Fletcher*—and its hypothetical negotiation—is inapposite here. In *Fletcher*, there was no practical, contractually specified way for the breaching party to cure its breach. Unlike in this case, the only way *Fletcher*'s breaching party could close the transaction in substantial conformity with the contract was by obtaining the injured party's consent, which was impractical given the fact of litigation. But Section 8.04 *does* specify how Invenergy can avoid obtaining Leaf's consent to a Material Partial Sale and yet perform the contract: Invenergy must simply arrange a Material Partial Sale that redeems Leaf's interest for the Target Multiple. Except for the relatively small matter of timing (Section 8.04 requires the Target Multiple to be distributed at the time of closing), it is still possible for Invenergy to substantially perform the contract as written by redeeming Leaf for the Target

---

[53] 2013 WL 6327997, at *14, *18, (Del. Ch. Dec. 4, 2013).

Multiple. Thus, in order to examine what substantial performance would look like—and thus calculate damages—there is no need for the court to imagine a negotiation as the Court of Chancery needed to do in *Fletcher*.

## IV. CONCLUSION

The Court of Chancery erred in its interpretation of Section 8.04, its award of only nominal damages, and in its application of the concept of efficient breach. Leaf is entitled to damages in the amount of the Target Multiple on the condition that Leaf surrenders its membership interest in Invenergy.[54] We accordingly **REVERSE** and **REMAND** for proceedings consistent with this opinion.[55]

---

[54] We agree with the Court of Chancery's conclusion that the fact that Section 15.11 of the LLC Agreement gave Leaf injunctive relief rights does not preclude Leaf from seeking damages. Nothing in Section 15.11 provides that it was the sole or exclusive remedy. In fact, Section 15.12 of the LLC Agreement expressly provides that the remedies in the contract are nonexclusive. A596 ("Remedies Cumulative. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.").

[55] We need not pass upon the merits of Invenergy's cross-appeal, which argued that the Court of Chancery erred by declining to strike XMS's appraisal. Because we conclude that Leaf was entitled to be redeemed for the Target Multiple and award damages for Invenergy's failure to do so, any issues relating to the put-call dispute resolution process are moot. Finally, we conclude that Invenergy's post-oral-argument motion to correct the record is without merit, and we therefore deny it.