# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LEVEL 3 PARENT, LLC, | ) | |
| | ) | |
|     Plaintiff and Counterclaim Defendant, | ) ) | |
| | ) | |
|     v. | ) ) | C.A. No. N24C-02-082 PAW CCLD |
| FIRSTDIGITAL COMMUNICATIONS, LLC, | ) ) ) | |
| | ) | |
|     Defendant and Counterclaim Plaintiff. | ) ) | |

Submitted: January 8, 2025
Decided: April 7, 2025

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Consideration of Plaintiff's Motion for Partial Summary Judgment;*

## GRANTED.

Catherine A. Gaul, Esq., of Ashby & Geddes, P.A.; and Kathryn A. Reilly, Esq.; and Michael Krantz, Esq., of Wheeler, Trigg O'Donnell LLP, *Attorneys for Plaintiff Level 3 Parent, LLC.*

Kevin M. Gallagher, Esq.; Katherine L. Mowery, Esq.; and Kaitlyn R. Zavatsky, Esq., of Richards Layton & Finger P.A.; and Stephen E. W. Hale, Esq.; Andrew Collins, Esq.; and Austin D. Bybee, Esq., of Parr Brown Gee & Loveless P.C., *Attorneys for Defendant FirstDigital Communications, LLC.*

**WINSTON, J.**

## I.  INTRODUCTION

This breach of contract action arises between two telecommunication services providers and relates to the parties' asset purchase agreement.  The center of parties' dispute—monies owed during a two-year transition period in which Defendant resold Plaintiff's telecommunication services to Defendant's own customers.  As a matter of law, Defendant is required to pay Plaintiff for the services it resold.  Accordingly, for the reasons set forth below, Plaintiff's Motion for Partial Summary Judgment is **GRANTED**.

## II.  FACTUAL BACKGROUND

### A.  THE PARTIES AND FINAL JUDGMENT

In October 2016, two telecommunications services providers, Plaintiff Level 3 Parent LLC's predecessor and non-party CenturyLink, Inc., publicly disclosed a plan for a merger.[1]  One year later, the U.S. Department of Justice ("DOJ") filed a complaint with the U.S. District Court for the District of Columbia to enjoin the planned merger, alleging antitrust violations in certain locations, including the Metropolitan Statistical Areas in Tucson, Arizona ("Tucson MSA").[2]

---

[1] Complaint (hereinafter "Compl.") ¶ 17. (D.I. 1).

[2] Compl. ¶ 18.

After the merger closed,[3] the District Court entered a final judgment (the "Final Judgment") that had been proposed by the DOJ and agreed to by all parties.[4] The Final Judgment required the consolidated company to sell certain assets (the "Assets") in the Tucson MSA to third-party acquirers.[5] The Final Judgment also provided that Level 3's original customers, who switched service providers, would not incur early termination fees for ending their Level 3 contract.[6] In compliance with the Final Judgment, Level 3 sought a third-party entity to acquire the Assets.

B.  THE ASSET PURCHASE AGREEMENT AND SECTION 7.9 AMENDMENT

FirstDigital, also a telecommunications services provider commanding its own set of retail customers,[7] purchased the Assets from Level 3 via an asset purchase agreement (the "APA"). Under the APA, First Digital paid $15 million for the Assets, which included Level 3's "rights, title and interest in all assets, tangible or intangible, to the extent used exclusively or primarily in the provision by [Level 3] to customer

---

[3] Compl. ¶ 19.

[4] Compl. ¶ 18-20.

[5] Compl. ¶ 21.

[6] Compl. ¶ 22, *see* Exhibit 1 to Transmittal Affidavit of Kaitlyn R. Cannan, Esq. in Support of Def.'s Ans. Br. in Opp. to Pl.'s Partial Motion for Summ. J. ("Final Judgment") § IV(K)(1) ("release the MSA Customers from their contractual obligations for any otherwise applicable termination fees for telecommunications services provided by Level 3 at locations within the applicable Divestiture MSA, in order to enable any MSA Customers, without penalty or delay, to elect to use the Acquirer for provision of such telecommunications services") (D.I. 50).

[7] Compl. ¶ 1-2, 17.

locations in the Market…."[8]  In accordance with the Final Judgment, Level 3 Tucson MSA customers who chose to switch providers—from Level 3 to FirstDigital (the "Transitioning Customers")—were released from their contractual obligations with Level 3, including termination fees.[9]  Under the APA, Level 3 was permitted to continue to provide services for Transitioning Customers who elected to remain with Level 3.[10]  To facilitate Level 3's continuation of services to its Tucson MSA customers (non-Transitioning Customers), the parties' affiliates entered into a Wholesale Services Agreement.[11]  Under the Wholesale Services Agreement, FirstDigital leased the Assets back to Level 3 in exchange for monthly payments.[12]

Although FirstDigital purchased Level 3's Assets, FirstDigital did not purchase Level 3's IP addresses and existing configurations that were necessary to provide telecommunications services (the "Existing Configurations").[13]  Therefore, for FirstDigital to provide uninterrupted services to the Transitioning Customers,

---

[8] Pl.'s Op. Br. in Supp. of its Mot. for Partial Summ. J. (hereinafter "Op. Br."), Ex. 3 (hereinafter "APA") § 1.1 at 12 (D.I. 40).

[9] APA § 7.8.

[10] Op. Br. at 6.

[11] APA § 2.7(a)(iv)(B); Op. Br., Ex. 4.

[12] Op. Br., Ex. 4.

[13] Op. Br. at 7; Def.'s Ans. Br. in Opp. to Pl.'s Partial Motion for Summ. J. (hereinafter "Ans. Br.") at 6-7 (D.I. 45).

FirstDigital needed to use Level 3's Existing Configurations.[14] Accordingly, both parties realized that there should be a transition period between the prospective closing date of the APA and the date when all the Transitioning Customers would finish migrating to FirstDigital.[15] This transition period would allow FirstDigital time to assign Transitioning Customers IP addresses and certain configurations necessary for uninterrupted telecommunications services.[16] To address the transition period issue, the parties agreed to amend Section 7.9 of the APA.[17]

Section 7.9, in its entirety, provides:

> Section 7.9 ***Service Configurations and IP Addresses***. For the purpose of providing uninterrupted services for customers transitioning to the Purchaser's network, Seller (together with its applicable Affiliates) shall leave in place for up to two (2) years following the Closing any customer's existing configuration(s) on the existing service routers of Seller and its Affiliates and on any customer premise equipment serving customer (the "Existing Configurations"). Purchaser hereby acknowledges and agrees that it will assign such customers new IP addresses and fully migrate them to Purchaser's network by no later than the date that is two (2) years after the Closing. Purchaser shall only be permitted to use the Existing Configurations or to resell any related services to Customers in accordance with the terms and conditions set forth in that certain Master Services Agreement, dated June 25, 2009, between Level 3 Communications, LLC and FirstDigital Telecom

---

[14] Ans. Br. at 6.

[15] Compl. ¶ 25; Ans. Br. at 5-6.

[16] Op. Br. at 7; Ans. Br. at 5-6.

[17] Compl. ¶ 32.

5

with the pricing for such services to be market competitive wholesale pricing.[18]

## C. THE TRANSITION PERIOD

After the APA closed and FirstDigital acquired ownership of the Assets, the transition period began, and Level 3 left its Existing Configurations in place.[19] During the transition period, FirstDigital used Level 3's Existing Configurations to provide services to its Transitioning Customers.[20] In turn, FirstDigital billed its Transitioning Customers for their use of the Existing Configurations.[21] Consequently, Level 3 sought payment from FirstDigital for the services FirstDigital provided to its Transitioning Customers which related to the Existing Configuration.[22] The parties disagreed on what and how much was owed under Section 7.9.[23]

---

[18] Compl., Ex. 2 (hereinafter "Section 7.9") (emphasis original). The referenced Master Services Agreement governs how Level 3 provides services to FirstDigital, including payment terms, privacy management, and use policies. Op. Br., Ex. 6.

[19] Op. Br. at 8; Ans. Br. at 8.

[20] Tr. Oral Argument, C.A. No. N24C-02-082 PAW CCLD (hereinafter "Tr."), at 10 ("Level 3 provided services using these [E]xisting [C]onfigurations to customers that chose to switch to FirstDigital."), 50 ("[T]he only thing that Level 3 is providing within the Tucson service area are [E]xisting [C]onfigurations."), 51 ("[T]he parties agreed … that FirstDigital could use those [Existing] [C]onfigurations.").

[21] Op. Br. at 9; Def.'s Answer with Affirmative Defenses and Counterclaim (hereinafter "Counterclaim") ¶¶ 45-47 (D.I. 26).

[22] Compl. ¶ 42; Counterclaim ¶ 56.

[23] Op. Br. at 10; Ans. Br. at 11-12.

### D. PROCEDURAL HISTORY

Unable to resolve their dispute, Level 3 commenced the instant action alleging FirstDigital failed to pay Level 3 for the services under Section 7.9, thereby breaching the APA.[24] FirstDigital filed an answer and counterclaim, to which Level 3 replied. Level 3 now moves for a partial summary judgment, requesting this Court to rule as a matter of law that Section 7.9 obligates FirstDigital to pay market competitive wholesale prices for services related to the Existing Configurations, which First Digital resold to the Transitioning Customers during the transition period.[25]

## III. STANDARD OF REVIEW

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[26] The movant bears the burden of demonstrating the undisputed facts entitle it to judgment as a matter of law.[27] When the movant sustains the initial burden of showing the nonexistence of any material issues of fact, the burden shifts to the nonmovant to substantiate its adverse claim by showing that

---

[24] Compl. ¶ 42.

[25] Op. Br. at 22.

[26] Super. Ct. Civ. R. 56(c)).

[27] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

there are material issues of fact in dispute.[28]  If the facts permit a reasonable person

to draw but one inference, the question is ripe for summary judgment.[29]

## IV. ANALYSIS

### A. SECTION 7.9 IS UNAMBIGUOUS AND LEVEL 3 ASSERTS THE ONLY REASONABLE INTERPRETATION.

The sole source of controversy between the parties is the interpretation of

the final sentence of Section 7.9 of the APA:[30]

> Purchaser shall only be permitted to use the Existing Configurations or to resell any related services to Customers in accordance with the terms and conditions set forth in that certain Master Services Agreement, dated June 25, 2009, between Level 3 Communications, LLC and FirstDigital Telecom with the pricing for such services to be market competitive wholesale pricing.[31]

Yet, there is much the parties agree upon.  FirstDigital bears no obligation to pay for

the "use" of the Existing Configurations.[32]  Existing Configurations include "certain

---

[28] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995) (citing *Moore*, 405 A.2d 679, 680).

[29] *Brzoska*, 668 A.2d at 1364 (citing *Wootten v. Kiger*, 226 A.2d 238 (Del. Super. 1967)).

[30] Pl.'s Reply Br. in Supp. of its Partial Mot. for Summ. J. (hereinafter "Reply. Br.") at 7 (D.I. 58); Tr. at 58.

[31] Section 7.9.

[32] Ans. Br. at 19 ("Simply put, there is nothing in Section 7.9 that requires FirstDigital to pay for the 'Existing Configurations' to be left in place."); Reply Br. at 8 ("FirstDigital's insistence that it is not contractually required to pay a fee for the Existing Configurations is both true and irrelevant.").

8

network configuration information (for example, IP addresses, device information, and telephone numbers) stored on equipment that Level 3 did not sell in the APA."[33] The phrase "with the pricing for such services to be market competitive wholesale pricing" refers to FirstDigital's obligation to pay the "market competitive wholesale pricing" and that this payment obligation is applicable to the earlier phrase "resell any related services."[34] In other words, the parties agree that FirstDigital is contractually obligated to pay the market wholesale price for reselling any "related services." As to the word "related," the parties rely on the dictionary definition— "connected by reason on an established or discoverable relation."[35] Finally, the parties agree that the term "related services" should be read in light of the preceding phrase "Existing Configurations."[36] The parties narrow dispute focuses on the interpretation of "any related services."

With these agreements in mind, Level 3 interprets "any related services" as referring to any services connected to the immediately preceding phrase in that same

---

[33] Ans. Br. at 18; *see also* Reply Br. at 10 ("the Section 7.9 Amendment authorized FirstDigital to use additional assets that were not transferred in the APA (the Existing Configurations)").

[34] Ans. Br. at 22; Reply Br. at 2.

[35] Op. Br. at 15 (citing *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/related); Ans. Br. 17 (citing *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/related).

[36] Ans. Br. at 17; Reply Br. at 7.

sentence—"Existing Configurations."[37] FirstDigital, however, contends that the term "related services" refers to "telecommunication services for customers located *inside* the Tucson MSA that connect *outside* the boundaries of the Tucson MSA."[38]

When interpreting an agreement, "the role of a court is to effectuate the parties' intent."[39] Thus, the Court "'interpret[s] clear and unambiguous terms according to their ordinary meaning.'"[40] A provision is ambiguous if it is fairly susceptible to two or more different meanings, not because the parties disagree upon its proper construction.[41] Extrinsic evidence is not considered unless the Court finds the text ambiguous.[42] Because the Court finds the text unambiguous, extrinsic evidence will not be considered.

---

[37] Op. Br. at 15-16.

[38] Ans. Br. at 22 (emphasis in original).

[39] *Lorillard Tobacco Co. v. Am. Legacy Found*., 903 A.2d 728, 739 (Del. 2006).

[40] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) (citing *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (quoting *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012))).

[41] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[42] *Id.* (citing *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)). Where a provision is ambiguous, the Court focuses on "extrinsic evidence [] that [] reveals the parties' intent *at the time they entered into the contract*." *Merck & Co., Inc. v. Bayer AG*, 2023 WL 2751590, *12 (Del. Ch. Apr. 3, 2023) (quoting *Eagle Indus. v. DeVilbis Health Care*, 702 A.2d 1228, 1233 n.11 (Del. 1997) (emphasis in original)).

In opposition to Level 3's interpretation—"any related services" refers to any services relating to the Existing Configurations—FirstDigital contends "[t]here's no resale happening with the [E]xisting [C]onfigurations. The resale is happening when Level 3 provides a network connection that FirstDigital doesn't already own."[43] Therefore, the meaning of "related services" "is best understood as a set of services relating to Transitioning Customers *other than* the separately defined "Existing Configurations."[44] According to FirstDigital, "related" in Section 7.9 is limited specifically to services "outside the Tucson MSA."[45] And, it need not pay for the services providing network connectivity *within* Tucson MSA because FirstDigital already "owned the fiber and network equipment in the Tucson MSA."[46]

FirstDigital's interpretation is unreasonable. First, there is no language in Section 7.9 that distinguishes between services provided inside or outside of the Tucson MSA. Second, a "contract interpretation that adds a limitation not found in the plain language of the contract is untenable."[47] Third, the Existing Configurations, which are on Level 3's network, are a connection that FirstDigital does not own. Even applying FirstDigital' s own analysis, it follows that FirstDigital is obligated

---

[43] Tr. 73.

[44] Ans. Br. at 17 (emphasis added).

[45] Ans. Br. at 23.

[46] Ans. Br. at 11, 20, 23.

[47] *Emmons v. Hartford Underwriters Ins. Co.*, 697 A.2d 742, 746 (Del. 1997).

11

to pay market competitive wholesale pricing for the resale of services related to the Existing Configurations. Accordingly, FirstDigital's interpretation fails as a matter of law and Level 3 provides the only reasonable interpretation.

### B. THE COURT WILL NOT CONSIDER MATTERS OUTSIDE THE SCOPE OF THE MOTION.

It is undisputed that Level 3 seeks neither liability nor damages related to the APA, but rather only the contractual interpretation of Section 7.9.[48] Nevertheless, FirstDigital contends summary judgment is unwarranted because Level 3 failed to identify any services relating to the Existing Configurations.[49] Whether services were actually provided is a factual issue related to liability. Likewise, FirstDigital's arguments relating to its affirmative defenses of wavier and estoppel raise issues beyond the narrow scope of Level 3's motion. "A party filing a motion for partial summary judgment may leave issues to be decided at trial that are outside the scope of the motion."[50] Accordingly, as there is no dispute as to the scope of Level 3's motion, FirstDigital's arguments are beyond the scope of this motion, and require resolution at a later stage of these proceedings.

### C. FIRSTDIGITAL'S RULE 56(F) REQUEST IS DENIED.

---

[48] Ans. Br. at 19; Oral Arg. at 29.

[49] Tr. at 55, 72.

[50] *North American Leasing, Inc. v. NASDI Holdings, LLC*, 276 A.3d 463, 470 (Del. 2022).

FirstDigital requests additional discovery to understand the "intent and understanding" of APA.[51] "[A] party opposing summary judgment may, pursuant to ... Rule 56(f), request limited discovery if it cannot present facts essential to oppose the summary judgment motion."[52] The party seeking discovery bears the burden of demonstrating the discovery requested is both specific and relevant "in light of applicable law."[53] In support of its Rule 56(f) affidavit, FirstDigital alleges it had no opportunity to take any discovery.[54] FirstDigital claims additional information is necessary to adequately respond to and oppose Level 3's motion, if it is not otherwise denied.[55]

FirstDigital contends it is entitled to discovery relating to the negotiating, drafting and implementing of Section 7.9.[56] But FirstDigital has failed to cite to any authority for the proposition that this Court should look beyond the unambiguous contractual language and consider communications between parties as a means of

---

[51] Ans. Br. 32-33; Andrew Collins, Esq. Affidavit (hereinafter "Collins Aff.") at ¶ 5 (D.I. 55).

[52] *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *28 (Del. Super. July 29, 2021) (citing *Corkscrew Mining Ventures, Ltd. v. Preferred Real Est. Fund Invs., Inc.*, 2011 WL 704470, at *3 (Del. Ch. Feb. 28, 2011)).

[53] *Aveanna Healthcare, LLC*, 2021 WL 3235739, at *28. (citing *Schillinger Genetics v. Benson Hill Seeds, Inc.*, 2021 WL 320723, at *16 (Del. Ch. Feb. 1. 2021)).

[54] Collins Aff. ¶¶ 3-4.

[55] *Id*. ¶ 5.

[56] Ans. Br. at 33; Collins Aff. ¶¶ 5-7.

contract interpretation. On the contrary, extrinsic evidence may not be used to interpret the parties' intent, vary the contract's terms, or create ambiguity. [57] Accordingly, the Court does not find the requested discovery relevant to the summary judgment motion.

## V.     CONCLUSION

For the foregoing reasons, Level 3's Motion for Partial Summary Judgment is **GRANTED**.


**IT IS SO ORDERED.**


/s/ *Patricia A. Winston*
**Patricia A. Winston, Judge**

---

[57] *Eagle Indus. v. DeVilbis Health Care*, 702 A.2d 1228, 1232 (Del. 1997).