**EFiled: May 22 2020 04:30PM EDT**
**Filing ID 65654392**
**Case Number 68,2020**

IN THE SUPREME COURT OF THE STATE OF DELAWARE

BOREALIS POWER HOLDINGS INC. §
and BPC HEALTH CORPORATION, §
§
    Plaintiffs and Counterclaim §
    Defendants Below, §
    Appellant, §
§
§
    v. §
§
§
HUNT STRATEGIC UTILITY §
INVESTMENT, L.L.C., § No. 68, 2020
§
    Defendant and Counterclaim §
    Below, § Court Below—Court of Chancery
    Appellee. § of the State of Delaware
§
§
BOREALIS POWER HOLDINGS §
INC., BPC HEALTH CORPORATION, § C.A. No. 2019-0582-SG
and TEXAS TRANSMISSION §
INVESTMENT LLC, §
§
    Defendants Below, §
    Appellants, §
§
§
    v. §
§
SEMPRA TEXAS HOLDINGS CORP. §
and SEMPRA TEXAS §
INTERMEDIATE HOLDING §
COMPANY, LLC, §
§
    Intervenor Plaintiffs Below, §
    Appellees. §
§
§

CHEYNE WALK INVESTMENT PTE LTD,

    Intervenor Plaintiff and Counterclaim Defendant Below, Appellant,

    v.

HUNT STRATEGIC UTILITY INVESTMENT, L.L.C., SEMPRA TEXAS HOLDINGS CORP., and SEMPRA TEXAS INTERMEDIATE HOLDING COMPANY, LLC,

    Defendants and Counterclaim Plaintiff Below, Appellees.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Submitted: April 22, 2020
Decided: May 22, 2020

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Richard I. Werder, Jr., Esq., Renita Sharma, Esq., Elisabeth B. Miller, Esq., Ryan A. Rakower, Esq., QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; William M. Lafferty, Esq., Thomas W. Briggs, Jr., Esq., Daniel T. Menken, Esq., and Aubrey J. Morin, Esq., MORRIS NICHOLS ARSHT & TUNNEL LLP, Wilmington, Delaware, *Counsel for Appellant Borealis Power Holdings Inc. and BPC Health Corporation.*

Neil A. Sterner, Esq., DECHERT LLP, New York, New York; Blake Rohrbacher, Esq., Brian S. Yu, Esq., Kevin M. Regan, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Counsel for Appellant Cheyne Walk Investments Pte Ltd.*

2

P. Clarkson Collins, Jr., Esq., Ian D. McCauley, Esq., Kathleen A. Murphey, Esq., MORRIS JAMES LLP, Wilmington, Delaware, *Counsel for Appellant Texas Transmission Investment, LLC*.

Jessica B. Pulliam, Esq., Monica Hughes Smith, Esq., BAKER BOTTS L.L.P., Dallas, Texas; Vernon Cassin, Esq., BAKER BOTTS L.L.P., Washington, D.C.; Peter J. Walsh Jr., Esq., J. Matthew Belger, Esq., Andrew H. Sauder, Esq., POTTER ANDERSON & CORROON LLP, Wilmington Delaware, *Counsel for Hunt Strategic Utility Investment, L.L.C.*

J. Christopher Shore, Esq., Alice Tsier, Esq., Vivake Prasad, Esq., WHITE & CASE LLP, New York New York; Aaron Colodny, Esq., WHITE & CASE LLP, Los Angeles, California; David C. McBride, Esq., Martin S. Lessner, Esq., Ryan M. Bartley, Esq., Paul J. Loughman, Esq., YOUNG CONAWAY STARGATT & TAYLOR, LLC, Wilmington Delaware, *Attorneys for Appellees Sempra Texas Holdings Corp. and Sempra Texas Intermediate Holding Company, LLC*.

**TRAYNOR**, Justice; for the Majority:

This dispute involves a purported conflict between two separate contracts binding two discrete sets of parties who together own Oncor Electric Delivery Company LLC ("Oncor").

Hunt Strategic Utility Investment, L.L.C. ("Hunt") owns a one-percent stake in Texas Transmission Holdings Corporation ("TTHC"), a utility holding company. The remaining ninety-nine percent is split equally between the Borealis entities (Borealis Power Holdings, Inc. and BPC Health Corporation, together, "Borealis") and Cheyne Walk Investment PTE LTD ("Cheyne Walk"). Thus, neither Borealis nor Cheyne Walk owns a majority stake in TTHC, as each owns 49.5%.

TTHC wholly owns Texas Transmission Finco LLC, which wholly owns Texas Transmission Investment LLC ("TTI"). TTI in turn owns 19.75% of Oncor. The remaining 80.25% of Oncor is held by Sempra Texas Holdings Corp. ("STH) and Sempra Texas Intermediate Holding Company, LLC ("STIH" and, together with STH, "Sempra").

Hunt's sale of its one-percent stake is subject to the TTHC Shareholder Agreement (the "TTHC SA"), which gives Borealis and Cheyne Walk a right of first offer in the event that Hunt wishes to sell (the "ROFO"). But Sempra argues that the sale is also subject to a separate contract—the Oncor Investor Rights Agreement (the "Oncor IRA")—which provides Sempra with a right of first refusal (the "ROFR") in the event Oncor LLC units are transferred. The Court of Chancery, on

4

an expedited basis, after parsing the complicated web of entities and their equally complicated histories, decided in Sempra's favor, holding that Hunt's sale of its 1% stake in TTHC was also a "transfer" of Oncor LLC units, as defined in the Oncor IRA. The court thus held that Hunt's proposed sale triggered Sempra's ROFR—a right that preempted Borealis's ROFO because the source of the ROFO was the TTHC SA, which itself stated that enforcement of the TTHC SA could not breach the Oncor IRA.[1]

After a *de novo* review of the language of both the TTHC SA and the Oncor IRA, we conclude that the Oncor IRA, which, by its terms, restricts transfers by Oncor's Minority Member—TTI—and not by Hunt, does not apply to Hunt's sale of its interest in TTHC. We therefore **REVERSE** the judgment of the Court of Chancery.

## I. FACTS

Before discussing the two contracts that give rise to the dispute at hand, it would be helpful to describe the nature and source of the parties' relationship to each other. We therefore begin with the relevant background of how Oncor and its parent, STH, came to be.

---

[1] *Borealis Power Holdings Inc. v. Hunt Strategic Util. Inv., L.L.C.*, 2020 WL 363670 (Del. Ch. Jan. 22, 2020) (hereinafter "Opinion Below").

## A. The Formation of Oncor and the Parties' Relationship

In October 2007, several financial institutions executed a $45 billion leveraged buyout of an entity, which they renamed Energy Future Holdings Corporation ("EFH") and that would later become STH. The leveraged buyout caused a downgrade of EFH's credit ratings. To mitigate the effects of the downgrade, EFH divided its businesses into two parts—unregulated and regulated. EFH put its regulated businesses in an entity—Oncor—with a series of intermediaries in between to preserve Oncor's credit quality. But adding legal intermediaries was insufficient to protect Oncor's credit rating. Hence, EFH sought to sell nearly 20 percent of Oncor, an action meant to decouple Oncor's credit ratings entirely from EFH's.

Borealis and Cheyne Walk each submitted separate bids for Oncor, but later proposed a structure under which they would purchase 19.75% of Oncor together. The Oncor stake would be owned by TTI, and Borealis and Cheyne Walk would each own 49.5% of TTI through an intermediary, TTHC. A third party would own the remaining 1%—a structure proposed for tax reasons. Hunt later agreed to be that 1% co-investor.

The parties provided and the Court of Chancery included, as an exhibit to its Memorandum Opinion,[2] a graphical representation of the eventual corporate structure and relationships between the parties that we find helpful and include here:



As is apparent from the chart, the parties to the litigation—Hunt, Borealis, Cheyne Walk, and Sempra—are all connected through one entity: Oncor. Sempra

[2] *Id.* at Ex. A.

is the owner, through Oncor Electric Delivery Holdings Company LLC ("Oncor Holdings"), of 80.25% of Oncor. Hunt, Borealis, and Cheyne Walk collectively own the remaining 19.75% through TTI, an entity which they then collectively own by splitting the ownership of the parent 1%-49.5%-49.5% respectively.

The parties executed two documents contemporaneously with the sale of 19.75% of Oncor's equity. First, TTHC's shareholders—i.e., Borealis, Cheyne Walk, and Hunt—executed an initial TTHC shareholders agreement "to govern the relationship among the parties in their respective capacities as holders of Shares in the capital of [TTHC] and as indirect holders of limited liability company interests in TTI LLC and Oncor."[3] Second, Oncor and its equityholders entered into the Oncor IRA, which contained the previously mentioned right of first refusal in Sempra's favor. The parties to the IRA are Oncor itself, the record owners of its units—TTI and Oncor Holdings—and EFH (now STH), which previously owned all of Oncor and sold the 19.75% in order to "ring-fence Oncor from the rest of its business to preserve Oncor's credit quality."[4] Borealis, Hunt, and Cheyne Walk are not parties to the Oncor IRA.

---

[3] *Id.* at *5 (citation omitted) (alterations in original); *see* App. to Opening Br. at A2411 (First Amended & Restated Shareholder Agreement) ("The sole purpose and business of [TTHC] shall be restricted to acquiring, owning, voting, managing and disposing of . . . securities and/or interests . . . in, and managing the business of, Finco and, indirectly through Finco, TTI LLC.").

[4] Opinion Below at *3.

In April 2014, EFH and many of its affiliates, but not Oncor, filed voluntary petitions for Chapter 11 bankruptcy.  Four years later, under a plan for reorganization, a California company named Sempra Energy purchased EFH.  After the Sempra Energy acquisition, EFH became "Sempra Texas Holding Corporation"—STH.

**B. Events Preceding Litigation**

In October 2018, Oncor attempted to acquire another company.  In connection with the funding of TTI's portion of the acquisition, Borealis, Cheyne Walk, and Hunt amended the TTHC Shareholders Agreement and created another intermediary between themselves and TTI—Texas Transmission Finco LLC ("TTFinco").  The amended shareholders agreement (the TTHC SA) provided a process for selling shares in TTHC, including a right of first offer for non-selling shareholders (the ROFO).  Under the ROFO, if and when a shareholder wanted to sell, it was required to provide a First Offer Notice, containing the quantity and price of shares it was willing to sell, to the other shareholders before marketing its shares.  The non-selling shareholders had twenty days to exercise their option to purchase a pro rata amount of shares for the stated price.[5]  The amended shareholders agreement also gave Hunt a "Minority Shareholder Special Period," during which Hunt could solicit non-

---

[5] The parties could also purchase the other non-selling party's shares if they did not exercise their option.

9

binding offers for its interest outside the normal process for a limited time after the execution of the agreement without first delivering a First Offer Notice. But if Hunt received a *bona fide* written offer, Hunt was still required to deliver a First Offer Notice with the opportunity to purchase.

After it became clear that Oncor's contemplated transaction would close, Hunt reached out to Sempra to see if it was interested in purchasing Hunt's 1% interest in TTHC during the special period. After some back and forth, Sempra concluded that the ROFR in the IRA took priority over the ROFO in the TTHC SA and sent a non-binding proposal to Hunt. Hunt then sent that proposal to Borealis and Cheyne Walk and requested cooperation in the diligence process. Borealis, however, declined to consent to the sale and asserted that it was not a permitted sale.

On July 11, 2019, Hunt and Sempra (through STIH, a wholly-owned subsidiary of STH) executed a share purchase agreement (the "SPA"). That same day, Hunt sent the SPA to Borealis and Cheyne Walk attached as an exhibit to a letter alleged to be a First Offer Notice. Borealis responded on July 22 that it would exercise its ROFO and purchase as many shares as were available, and that it considered any attempt to transfer those shares to any other third party a breach of the ROFO. In response, Sempra sent a letter to Borealis, Cheyne Walk, TTHC, TTFinco, and TTI stating that it was exercising its ROFR.

10

A few days later, Borealis filed a complaint in the Court of Chancery asserting a claim against Hunt for breach of the TTHC SA. Borealis also sought a temporary restraining order enjoining Hunt from transferring the Hunt shares to Sempra. Sempra intervened, seeking declaratory judgments against Borealis and Hunt and asserting a breach-of-contract claim against TTI. Cheyne Walk also intervened and sought declaratory judgments against Hunt and Sempra.

**C. The Relevant Contractual Provisions**

The parties contest the application of two contracts: the TTHC SA and the Oncor IRA.

### 1. The Oncor IRA

Section 3.1 of the Oncor IRA, entitled "Restrictions On Transfer of LLC Units," provides that "[t]he Minority Member and its Permitted Transferees may only Transfer LLC Units as follows . . . ." before listing a number of conditions under which the Minority Member and its Permitted Transferees may transfer Oncor LLC Units.[6] Section 3.9 of the Oncor IRA, entitled "Right of First Refusal" (the ROFR), provides that,

> In the event that a Selling Member intends to Transfer LLC Units . . . such Selling Member shall deliver to EFH, so long as it has an indirect interest in the Company and thereafter Parent . . . written notice of its intention to Transfer LLC Units . . . and the terms and conditions of the proposed Transfer . . . . The Notice of Intention to Sell shall be accompanied by a written offer . . . to sell or otherwise Transfer to the

---

[6] App. to Opening Br. at A2233.

11

ROFR Party . . . for a price in cash . . . all, but not less than all, of the Offered Units, on the same terms and conditions as set forth in the Notice of Intention to Sell.[7]

The section further provides that "the Minority Member and its Permitted Transferees . . . shall not Transfer their LLC Units . . . unless such Selling Members have first complied with this Section 3.9."[8] The term "Offered Units" in this section is defined as "LLC Units or IPO Units, as the cases may be."[9]

These provisions contain several defined terms, of which the most important for our purposes are "Minority Member," "Transfer," and "Selling Member." "Minority Member" is defined in the Preamble of the IRA[10] as "Texas Transmission Investment LLC"[11]—TTI, for short. "Selling Member" is defined in Section 3.9 as "the Minority Member" or the Minority Member's "Permitted Transferee."[12] Finally, "Transfer"

means any direct or indirect transfer . . . of any LLC Units (or any interest (pecuniary or otherwise) therein or rights thereto). In the event that any Member that is a corporation, partnership, limited liability company or other legal entity (other than an individual, trust or estate) ceases to be controlled by the Person controlling such Member or a Permitted Transferee thereof, such event shall be deemed to constitute a 'Transfer' subject to the restrictions on Transfer contained or referenced herein.[13]

---

[7] *Id.* at A2253.
[8] *Id.*
[9] *Id.*
[10] *Id.* at A2269 ("'Minority Member' has the meaning set forth in the Preamble.").
[11] *Id.* at A2229.
[12] *Id.* at A2253.
[13] *Id.* at A2272.

As mentioned, the only parties to the Oncor IRA are Oncor, its immediate shareholders (TTI and Oncor Holdings), and STH, formerly known as EFH.

## 2. The TTHC SA

In like manner, the only parties to the TTHC SA are the shareholders of TTHC as well as the entity itself. Specifically, those parties are TTHC, Borealis, Cheyne Walk, and Hunt. Section 6.4, entitled "Right of First Offer" (the ROFO), provides that "[i]f at any time any Shareholder . . . wishes to sell some or all of [its] Shares . . . , it shall give notice thereof (the "First Offer Notice") . . . to the other Shareholders . . . . [This] [n]otice shall state that the Selling Shareholder wishes to sell such number of the Shares . . . held by it and shall state the price . . . which the Selling Shareholder is willing to accept for such . . . Shares."[14] The TTHC SA also provides for a special period, during which

> the Minority Shareholder shall be free to conduct a marketing process with respect to the Shares held by it and to make non-binding offers to sell . . . such Shares to (or from) one or more Third Parties . . . on such terms as the Minority Shareholder shall determine in its sole discretion, in each case without delivering a First Offer Notice to the Other Shareholders; provided that . . . if . . . the Minority Shareholder receives a bona fide written offer from a Third Party . . . to purchase the Shares held by it that it has determined it would like to accept, it shall deliver a First Offer Notice, together with a copy of the bona fide written offer . . . to the Other Shareholders prior to accepting such offer.[15]

Once a First Offer Notice has been received, Section 6.4.3 provides that

---

[14] *Id.* at A2423.
[15] *Id.* at A2423–24.

[e]ach of the Other Shareholders shall have the right, exercisable by notice given to the Selling Shareholder within 20 Business Days after receipt of the First Offer Notice: . . . to agree that it will purchase its pro rata share . . . of the Optioned Shares for the price and on the terms of payment set out in the First Offer Notice, or if it wishes to purchase more than its pro rata share, to indicate how many Optioned Shares more than its pro rata share it wishes to purchase . . . [OR] to agree that the Selling Shareholder may sell all the Optioned Shares to a Person who is at arm's length with the Selling Shareholder.[16]

All transfers contemplated under the TTHC SA, however, are subject to Section 6.3, entitled "Overriding Prohibition on Transfer." That section provides that,

[n]otwithstanding anything to the contrary in [the TTHC SA], a Shareholder shall not be permitted to Transfer any Shares, and neither Holdco nor any other Shareholder will recognize any such purported Transfer or any purported Shareholder related thereto, if such Transfer would result, directly or indirectly, in a breach of any of the LLC Agreement, the Investor Rights Agreement or the Registration Rights Agreement.[17]

### D. The Court of Chancery Decision

The problem presented to the Court of Chancery was whether Hunt's sale triggered (a) the ROFR in the Oncor IRA and/or (b) the ROFO in the TTHC SA, and, (c) if both applied, which was to be given priority. After an expedited trial, the court found that both the TTHC SA and the Oncor IRA applied, providing Borealis and Sempra separate contractual rights to purchase Hunt's shares. First, the court

---

[16] *Id.* at A2424–25.
[17] *Id.* at A2423.

found that under the TTHC SA, Hunt's receipt of the share purchase agreement from Sempra was a *bona fide* written offer from a non-excluded third party during the special period that triggered Hunt's requirement to deliver a First Offer Notice to Borealis and Cheyne Walk. The court further found that Hunt's notice delivered to Borealis and Cheyne Walk on July 11, 2019 fulfilled the requirements of a First Offer Notice because it included the shares and price, and that Borealis validly exercised its right to purchase its pro rata portion of Hunt's shares. But the court held that Borealis' right was conditional because the TTHC SA prohibits transfers that result, directly or indirectly, in a breach of the IRA.

The court then found that Sempra also had a contractual right to purchase Hunt's shares originating in the Oncor IRA ROFR. It concluded that a sale by Hunt of its shares to Borealis would, in fact, be a "Transfer" of Oncor LLC Units by TTI under the Oncor IRA. The court noted that the definition of "Transfer" is "remarkably broad" and concluded that it includes the sale of TTHC shares because the sale of TTHC shares constituted an "indirect" sale.[18] And the court considered this an "involuntary" transfer of LLC Units because the sale is "one of nearly identical interest" as selling Oncor LLC Units themselves.[19] Because TTHC wholly and only owned TTFinco, TTFinco wholly and only owned TTI, and TTI only owns

---

[18] *Opinion Below* at *14.
[19] *Id.* at *14-15.

Oncor LLC Units, the court found that holding TTHC shares is "to indirectly hold Oncor LLC Units."[20]

The court thus held that Borealis' purchase of Hunt's shares constituted a "Transfer" under the IRA and triggered the requirement to offer the shares to Sempra. Because Sempra has the right to purchase the shares, and it seeks to exercise that right, selling to Borealis would breach the IRA. And because the shareholder agreement prohibits transfers that breach the IRA, Sempra's exercise of its right to purchase extinguished Borealis' right to purchase. Consequently, the court found that Sempra was the only party with the right to purchase the Hunt shares and entered judgment in Sempra's favor. Borealis and Cheyne Walk then filed this expedited appeal.

## II. STANDARD OF REVIEW

We review questions of contract interpretation *de novo*.[21]

## III. ANALYSIS

On appeal, Borealis argues that the Court of Chancery erred when it found that Sempra has the superior right to purchase Hunt's shares. It takes a two-pronged approach to this argument. First, Borealis makes three arguments as to why Hunt's sale does not trigger Sections 3.1 and 3.9 of the Oncor IRA: (1) the sale was not by

---

[20] *Id.*

[21] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

the parties restricted in Section 3.1; (2) the sale fell outside the definition of "transfer" as used in those sections; and (3) the sale does not involve "Oncor LLC Units" as described in the Oncor IRA. Second, Borealis argues that, even if Sempra has a ROFR that takes priority over Borealis's ROFO, the TTHC SA prohibits Hunt from selling its shares to Sempra without Borealis's and Cheyne Walk's consent—which they did not give.

We are persuaded that the Oncor IRA does not apply to the Hunt Sale because the ROFR in Section 3.9 is only triggered by transfers by the Minority Member and its Permitted Transferees, and Hunt is neither. Because Section 3.9 is only triggered by transfers by the Minority Member, it does not matter whether the Hunt sale constitutes a "transfer" as contemplated by the Oncor IRA, or whether the sale transfers "Oncor LLC Units." Put another way, the fact that the ROFR is only triggered by transfers by the Minority Member is dispositive in Borealis's favor regardless of whether the Hunt Sale could be said to effect an indirect transfer of Oncor LLC Units. This conclusion in Borealis's favor moots its second argument regarding whether a transfer to Sempra violates the TTHC SA.

**A. Sempra's ROFR is triggered only by transfers by the Minority Member.**

The Oncor IRA is governed by New York law and the TTHC SA is governed by Delaware law. Fortunately, New York and Delaware take similar approaches to

17

contract interpretation: namely that "[i]f a contract's meaning is plain and unambiguous, it will be given effect."[22]

Sempra's ROFR is found in Section 3.9 of the Oncor IRA, which provides that "[i]n the event that a *Selling Member* intends to Transfer LLC Units . . . such *Selling Member* shall deliver to EFH . . . a written offer . . . to sell or otherwise Transfer to the ROFR Party . . . the Offered Units, on the same terms and conditions . . . ."[23] That section also provides that "*the Minority Member and its Permitted Transferees (each a "Selling Member")* shall not Transfer their LLC Units . . . unless such Selling Members have first complied with this Section 3.9."[24] That language unambiguously states that the ROFR applies only to "Transfers" of "LLC Units" executed by the Minority Member (TTI) or its Permitted Transferees.

Neither party argues that Hunt is a Permitted Transferee, and Hunt is plainly not the same as TTI. Thus, any transfer, indirect or otherwise, of "Oncor LLC Units" that results from the Hunt sale is effected by Hunt, not TTI.

---

[22] *In re IBP S'Holders Litig. v. Tyson Foods*, 789 A.2d 14, 54–55 (Del. Ch. 2001) (interpreting New York law). Delaware law is the same; "we interpret clear and unambiguous terms according to their ordinary meaning. Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

[23] App. to Opening Br. at A2253 (emphasis added).

[24] *Id.* (emphasis added).

Nor can it be said that Hunt's attempt to sell its equity stake in TTHC, TTI's controller, is the same as TTI "intend[ing] to transfer [Oncor] LLC Units."[25] As the Court of Chancery recognized, "the triggering event for [Sempra's ROFR] is TTI's 'intent'—voluntary or involuntary—to transfer LLC units 'or an interest therein or rights thereto.'"[26]  In our view, Hunt's sale of its shares is simply not the same as TTI intending to Transfer its units, indirectly or otherwise.  The subjects (Hunt and TTI) of these two clauses are different and irreconcilable.  To hold otherwise would be to impute the contractual intentions of a minority member of a company's controller to the company itself—a result that runs contrary to settled corporate-law principles.[27]  We thus conclude that, because Hunt is neither the Minority Member nor a Permitted Transferee, and its attempt to sell its stake in TTHC does not manifest an intent on TTI's part to transfer Oncor LLC Units, the Hunt sale does not trigger Section 3.9 of the Oncor IRA.

**B. The definition of "Transfer" does not trigger the application of Section 3.9 to to entities or persons other than the Minority Member.**

Despite the plain language of Section 3.9, Sempra argues that the intent of the parties to the Oncor IRA—TTI, Sempra, and Oncor itself—was to bind TTI's

---

[25] *Id.*

[26] *Opinion Below* at *15 n.181.

[27] 6 *Del C.* § 18-402 ("[T]he management of a limited liability company shall be vested in its members in proportion to the then current percentage or other interest of members in the profits of the limited liability company owned by all of the members, *the decision of members owning more than 50 percent of the said percentage or other interest in the profits controlling*." (emphasis added)).

19

upstairs equityholders and restrict their transfers of that upstairs equity. In support of this argument, Sempra turns to the definition of the term "Transfer" in the Oncor IRA. It argues that the first sentence of the definition, which purports to encompass "any direct or indirect transfer" of Oncor LLC Units, includes any transfers in upstairs equity, because transfers of upstairs equity indirectly transfer control of Oncor LLC Units. Sempra also argues in the alternative that, even if the Hunt sale is not a "Transfer" under the first sentence, it is a "Transfer" under the second sentence, because a transfer of Hunt's interest to Borealis or Cheyne Walk would change the control of TTHC, and thus of TTI.[28]

But both of these contentions suffer from the same flaw as the previously addressed arguments; they elide the *subject* of the operative sentence in Section 3.1 of the Oncor IRA of which the the verb phrase "may only Transfer" serves as the predicate. That subject is not accidental or unimportant—it is the same subject for which the verb phrase "intends to Transfer" serves as the predicate in Section 3.9. As noted, that subject, which is stated conjunctively as "the Minority Member and its Permitted Transferees," or the "Selling Member," does not include Hunt. It is therefore unnecessary—and, in our view inappropriate—to parse the definition of "Transfer" to determine the scope of Section 3.1 and Section 3.9; the subjects of the

---

[28] This argument was raised in a footnote, which, alone, would justify passing over it. Appellee Sempra's Answering Br. at 30 n.13. "Footnotes shall not be used for argument ordinarily included in the body of a brief." Del. Supr. Ct. R. 14(d)(iv).

20

opening sentences in both of those sections do that for us.  In sum, Hunt is not TTI, nor is it a Permitted Transferee, nor can it, as a minority shareholder of TTI's controller, express the intent of TTI or unilaterally cause it to act.  Hunt's sale therefore does not trigger Sempra's ROFR.  Accordingly, Borealis's ROFO applies and the Hunt sale may not go through without first satisfying that ROFO.

## IV.  CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the Court of Chancery in favor of Sempra as set forth in its January 22, 2020 Memorandum Opinion and February 5, 2020 Order and Partial Final Judgment and **REMAND** with instructions to enter judgment in favor of Borealis consistent with this Opinion.

21

**VAUGHN**, Justice, concurring with whom **MONTGOMERY-REEVES**, Justice, joins:

The Court of Chancery found that the sale of Hunt's shares in TTHC "constitutes an indirect sale, and, therefore, a Transfer of Oncor LLC Units under the Oncor IRA."[29] The Court relied upon the first sentence of the definition of Transfer, which includes "any direct or indirect transfer" of Oncor LLC units, or any interest therein.[30] When this part of the definition of Transfer is applied to Section 3.9, I agree with the Majority that Sempra's right of first refusal is triggered only when TTI is the transferor.

The second sentence of the definition of Transfer brings within it an event which may occur in TTI's chain of ownership. It includes any "event" by which a Member (TTI) "ceases to be controlled by the Person controlling such Member."[31] It continues that "such event shall be deemed to constitute a 'Transfer' subject to the restrictions on Transfer contained or referenced herein."[32] Sempra argues that this second sentence provides an alternative basis for affirming the Court of Chancery because the sale of Hunt's shares to Borealis will result in TTHC shareholders ceasing to control TTI in favor of Borealis assuming a controlling position.

---

[29] *Borealis Power Holdings Inc. v. Hunt Strategic Util. Inv., L.L.C.*, 2020 WL 363670, at *15 (Del. Ch. Jan. 22, 2020).
[30] App. to Opening Br. at A2272.
[31] *Id.*
[32] *Id.*

Since Transfer is a defined term, the second sentence of the definition is incorporated into Section 3.9 and made a part thereof as if set forth therein. The effect of the second sentence is to subject any event which it describes to Sempra's right of first refusal. Borealis acknowledges that "the second sentence of the definition of Transfer, unlike the first sentence, addresses those limited situations where activity that affects the ownership of TTI–rather than activity by TTI itself–is 'deemed to constitute' a Transfer that is 'subject to the restrictions on Transfer' in the IRA."[33]

Borealis argues, however, that the second sentence does not apply to Hunt's sale of its 1% interest in TTHC to Borealis, and we agree. On the record before us, we do not think it can be reasonably concluded that, when Hunt sells its shares to Borealis, a party who controlled TTI before that event will cease to control TTI as a result of that event.

We therefore concur in the judgment of the Court.

---

[33] Opening Br. at 32. (quoting App. to Opening Br. at A2272).