# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MACK BROTHERS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C.A. No. 2025-0422-DH |
| KEYPOINT INTELLIGENCE, LLC, a | ) |
| Delaware limited liability company, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## FINAL POST-TRIAL REPORT

Report: October 29, 2025
Date Submitted: October 15, 2025

Patrick C. Gallagher, JACOBS & CRUMPLAR, P.A., New Castle, Delaware; David I. Brody, Eyal Schwartz, SHERIN & LODGEN LLP, Boston, Massachusetts; *Attorneys for Plaintiff Mack Brothers*.

Peter J. Walsh, Jr., Tyler J. Leavengood, Samuel G. Gustafson, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Stephen L. Ram, Morgan Williams, STRADLING YOCCA CARLSON & RAUTH LLP, Newport Beach, California; *Attorneys for Defendant Keypoint Intelligence, LLC*.

**HUME, M.**

In the legal profession, language is our craft. Precise, consistent use of terms when negotiating business affairs avoids simple disputes and burdensome litigation. This action solely concerns the meaning of "member." But for Defendant's casual use of "member" and "membership interest" in hiring, employing, terminating, and arbitrating against Plaintiff, the following analysis would be moot. Plaintiff Mack Brothers filed suit to compel the inspection of books and records belonging to Defendant Keypoint Intelligence, LLC, his former employer. When Keypoint hired Brothers, it assigned him a contingent economic interest subject to vesting requirements it called the "profits-incentive pool." In the course of dealing, Keypoint called Brothers a profits-interest member. The dispositive question is whether such profits-interest membership granted Brothers the requisite standing to compel inspection of books and records as provided under 6 Delaware Code Section 18-305. Following an analysis of the factual background of the litigation, the LLC's Operating Agreement, the communication between the parties, and the default provisions of the Delaware LLC Act, the Court holds that Brothers is not a member and lacks standing to sustain the action.

# I. BACKGROUND

Plaintiff Mack Brothers initiated this action against Defendant Keypoint Intelligence, LLC. The following facts were either stipulated to by the parties or found by a preponderance of the evidence at trial.[1]

## A. Factual Development

Keypoint Intelligence, LLC is a Delaware Limited Liability Company with its principal place of business in the state of New Jersey founded in 2011 under the name Buyers Laboratory, LLC.[2] In 2016, Buyers Laboratory changed its name to Keypoint Intelligence, LLC (KPI) and adopted an operating agreement still in effect to date.[3] Three years later, Keypoint Holdings, LLC (KPH) acquired a 100%

---

[1] *See* Pre-Trial Stipulation and Order, D.I. 70 ("PTO"). The trial record comprises 19 joint exhibits and three deposition transcripts. The trial was conducted on the paper record, without live witness testimony. Joint exhibits are cited as "JX ___." Lodged depositions not included in the joint exhibits are cited as "[Name] Dep. Tr. __." References to the docket index are cited as "D.I. __." I grant evidence the weight and credibility I find it deserves. *See Lynch v. Gonzalez*, 2020 WL 4381604, at *5 (Del. Ch. July 31, 2020) ("[The Court's] credibility determinations are based on the testimony and evidence submitted to make up the record.") (citing *Eagle Force Hldgs., LLC v. Campbell*, 2019 WL 4072124, at *13 (Del. Ch. Aug. 29, 2019), *aff'd in part, rev'd in part*, 2020 WL 3866620 (Del. July 8, 2020)).

[2] Complaint, D.I. 1, ¶ 6; JX 5, at 2.

[3] JX 13, 44:6-20. The 2016 Operating Agreement slightly modified the 2011 Operating Agreement, most notably changing the entity's name. JX 16. The 2016 Operating Agreement remains in force at the time of this decision. *See* Compl., D.I. 1, ¶ 7; JX 16.

membership interest in Keypoint Intelligence, LLC.[4]  Following the purchase, KPH was the sole member of KPI.[5]

Atar Capital, LLC, is a private equity firm that holds KPH in its portfolio.  KPH has two owners: Atar KPI Investors (25%) and KPI Investors LLC (75%).[6]  Cyrus Nikou serves as Chief Executive Officer of KPH and is a managing partner of Atar.[7]  Stanley Huang is director of Atar and serves on KPH's Board of Directors.[8]

In 2019, Cyrus Nikou hired Mack Brothers on KPI's behalf.  Brothers signed an Employment Agreement that delineated some of Brothers's compensation and executive rights.[9]  The Agreement informed Brothers of his rights to participate in a profits incentive pool.[10]  KPH allocated 5% of its equity interest in KPI to the

---

[4] PTO ¶ 13.

[5] JX 13, 127:17-19.  KPI maintains that KPH remains the sole member.

[6] JX 6, at 4.

[7] *Id.* at 5.

[8] *Id.*

[9] *See* JX 5.  In this opinion, the Court refers interchangeable to the Employment Offer and Employment Agreement.

[10] *Id.* at 2.

pool.[11] Brothers could retain up to 4% of the pool for himself with discretion to allocate up to 1% of the pool to other senior management.[12]

At the time KPI entered into employment negotiations with Brothers, Brothers served as the Chief Products Officer at Forrester Research, Inc.[13] After receiving the Employment Agreement, Brothers sought clarification about the profits incentive pool. Because Brothers expected to receive $7.1 million over the next four years in his position at Forrester, and KPI could not guarantee such salary compensation, Brothers wanted to confirm that the profits incentive pool could provide comparable compensation.[14]

To understand the profits incentive pool, Brothers corresponded with Gustav Brown, a recruiter who communicated on behalf of KPH management.[15] Brown described the profits incentive plan as "a form of equity ownership that is traditionally employed in LLC ownership situations where the ownership is generally in the form of 'membership interests' instead of shares like you would find in the case in a C-Corporation."[16] Brown described that Brothers's equity interest

---

[11] JX 13, 75:9-12.

[12] JX 5, at 2.

[13] JX 9, at 4.

[14] *See* JX 6, at 6-7.

[15] JX 4.

[16] *Id.* at 2.

would vest once "a particular hurdle or value has been met upon a transaction or exit."[17] To illustrate the valuation of Brothers's expected distribution, Brown provided the following "generic" formula:

> Profit distribution to Mack = (Enterprise value at exit – (minus) company debt – (minus) return of initial share capital – (minus) preferred interest on initial share capital – (minus customary transaction fees – (minus) any specific working capital adjustments * [multiplied by] (Mack's profit interest ownership).[18]

The email exchange between Brothers and Brown solely focused on Brothers's economic rights under the employment offer. The two never discussed Brothers's management rights or responsibilities. Brothers also discussed the profits interest with KPI's CFO, Stanley Huang. Huang explained that the profits interest was "a form of equity with the company," which needed to contain an "economic aspect to it . . . to qualify under IRS rules . . . as a capital gain rather than an ordinary gain."[19]

Brothers signed the Employment Agreement and served as KPI's CEO for just over a year.[20] While employed at KPI or thereafter, Brothers never received a

---

[17] *Id.* Brothers understood the hurdle as a reference to a liquidity event, such as a transaction, sale, or recapitalization of the entity. JX 14, 50:10-21.

[18] JX 4, at 2.

[19] JX 14, 45:2-6. Brothers understood the tax implications that Huang referred to, as he ultimately filed an IRC Section 83(b) election. *See* JX 17.

[20] JX 14, at 27:4-7.

K-1 for his profits interest.[21] KPI was a disregarded entity because it was solely owned by KPH.[22] On June 31, 2021, KPI terminated Brothers's employment.[23] The next day, Huang called Brothers to discuss the profit interest and KPI's position on the vesting schedule.[24] In the severance agreement, KPI stated that 0.8% of Brothers's interest in the profits interest incentive pool had vested at the time of Brothers's termination.[25] The agreement further proposed that in exchange for Brothers's signing an Amended and Restated Limited Liability Company Agreement, KPI would "agree to waive the Company's rights to repurchase" Brothers's vested profits interest.[26] Brothers declined to sign the Amended LLC Agreement.[27] Brothers objected to the Agreement's incorrect memorialization of his profits interest percentage. Brothers contended that he had a 1% already vested profits interest (which would become 4% at the termination of the vesting period), not the 0.8% contained in the amended agreement.[28] Brothers also objected to the

---

[21] Brothers Dep. Tr., D.I. 72, 89:19-22. Brothers was familiar with K-1s because he had received them from other entities in which he had ownership interests. *See id.*, 90:5-16.

[22] JX 13, 160:20-161:3.

[23] Brothers Dep. Tr., 38:17-21.

[24] JX 19.

[25] JX 7, at 2.

[26] *Id.*

[27] Huang Dep. Tr., D.I. 72, 114:15-22.

[28] Brothers Dep. Tr., 67:6-14.

Amended Agreement's provision for (1) two distinct classes of shares not present in the 2011 agreement and (2) a "self-dealing" clause.[29]    Brothers later declined to sign a 2024 amendment to the LLC Operating Agreement.[30]

To contest KPI's position on Brothers's vested interest, Brothers initiated arbitration proceedings to establish his profits interest.[31] Brothers contended that, as of August 2021, "he is vested in 1.0% of the profits interest . . . and that vesting has continued and will continue at the rate of .067 per month through May 2025."[32] Applying New York contract law, the Arbitrator determined that while the Employment Agreement was ambiguous, extrinsic evidence indicated that Brothers's profits interest had vested and would continue to vest in the following years.[33]

---

[29] *Id.* at 68:7-16.

[30] *Id.* 100:8-10.

[31] *See* JX 9.

[32] *Id.* at 1.

[33] *Id.* at 19, 24-5. Brothers first characterized the arbitrator as declaring that Brothers "held a 4% Membership interest in KPI . . . ." Compl. ¶¶19-20. In his opening brief, however, Brothers claimed that the membership issue "was not fully or fairly litigated in the Arbitration," so this Court is not precluded from determining that he is a member of KPI. Pl's Opening Pre-Trial Br., D.I. 62, at 21.  The opening brief plays fast and loose in representing the Arbitrator's language. Brothers wrote that "the Award found that the 'only written communications by and between' the partis regarding the transfer are 'the Employment Agreement . . . and the email exchange[] . . . .'" Pl.'s Opening Pre-Trial Br., 21 (citing the Arbitration decision, JX 9, at 11).  KPI  notes that the Arbitrator referred to the "profits interest," not the "transfer," in the cited section. Def.'s Answering Pre-Trial Brief, D.I. 65, at 22. While Brothers omitted "transfer" from the Arbitrator's quoted language, the alteration suggests that the Arbitrator found that the transfer was ambiguous.

After prevailing in arbitration, Brothers filed an IRC Section 83(b) election with the Internal Revenue Service for his profits interest in KPI.[34] In the election, Brothers referred to the restricted property as "4% profits interest Keypoint Intelligence LLC."[35]

On March 3, 2025, Brothers, acting through counsel, made a demand to inspect KPI's books and records.[36] In the demand, Brothers asserted that he had a membership interest in KPI, and that he exercised his rights under 6 *Del. C.* 18-305 and Article IV, Section 4.1 of the LLC Operating Agreement to inspect certain books and records. Brothers articulated that his purpose for inspection was to "verify[] and confirm[] the valuation of KPI, which "directly affects the value of Mr. Brothers' membership interest . . . ."[37] Brothers then identified six categories of records to which he required access:

1. Records reflecting KPI's business status and financial condition, including but not limited to quarterly performance results/reviews and annual audited results;
2. KPI's federal, state, and local income tax returns for the years 2021 through 2024;
3. A current list of the name and last known business, residence, or mailing address of each member and manager;

---

Not so. The Arbitration decided the amount Brothers's profits interest had vested and his entitlement to continued vesting, nothing more. *See* JX 9, at 25.

[34] JX 17.

[35] *Id.*

[36] JX 10.

[37] *Id.* at 1.

8

4. KPI's articles of organization, all its amendments and restatements, and any powers of attorney used to execute those documents;
5. KPI's operating agreement and its amendments and restatements; and
6. Information regarding each member's past and agreed-upon future contribution to KPI, including the amount of cash and a description of property or services contributed, and the date on which each member became a member.[38]

KPI's counsel responded to Brothers's request by offering to provide him with access to the records in Santa Barbara, where counsel's offices were located.[39] The proposed inspection never took place. Soon following, Brothers filed this action, seeking to compel inspection of the same six categories of documents identified in his demand letter.[40]

## B. Procedural Posture

Brothers filed his complaint to compel the inspection of books and records under Section 18-305 of the Delaware Limited Liability Act on April 18, 2025. Brothers also sought declaratory judgment that he was entitled to indemnification from KPI based on KPI's anticipatory breach of contract.[41] Almost one month later, KPI moved to dismiss pursuant to Court of Chancery Rule 12(b)(6) for failure to

---

[38] *Id.* at 2.

[39] JX 11. Brothers objected to the location of inspection in part because Section 4.2 of the operating agreement required that the Manager maintain the records "at the principal office of the Company." JX 1, at 4.

[40] Compl., ¶ 35.

[41] *Id.* ¶¶ 43-44.

state a claim because Brothers was not a KPI member and therefore lacked standing. On June 24, 2025, the Court heard oral argument on the motion to dismiss. The Court dismissed Brothers's indemnification claims without prejudice and deferred ruling on the inspection claim until trial under Court of Chancery Rule 12(i). The Court determined a complete trial record would clarify the factual issues surrounding the standing question.[42] A one-day trial took place on October 15, 2025, and the Court took the matter under advisement.

## II.    ANALYSIS

Under 6 Delaware Code Section 18-305(a), "Each member of a[n LLC] . . . has the right" to obtain books and records from the LLC. The right to obtain such records is status related so only members and managers may compel inspection. *See Gill v. Regency Holdings, LLC*, 2023 WL 4607070, at *10 (Del. Ch. June 26, 2023). Any party who fails the status requirement cannot proceed with a suit under the books and records statute. Section 18-305(a) further subjects inspection rights to a "purpose reasonably related to the member's interest" as an LLC member. The LLC operating agreement may expand or limit such statutory rights. *See Gill*, 2023 WL 4607070, at *9.

---

[42] *See* MTD Tr. Ruling, D.I. 54, at 8:4-9 (quoting *Mickman v. Am. Int'l Processing, L.L.C.*, 2009 WL 891807, at *2 (Del. Ch. Mar. 23, 2009) ("Based on the flexible and less formal nature of LLCs, it is reasonable to consider evidence beyond the four corners of the operating agreement . . . .").

The question at the heart of this case concerns whether Brothers is a member of KPI following participation in the "profits-incentive pool." Brothers contends that the profits interest constitutes a form of membership. KPI counters that the profits interest constituted an assignment of certain economic rights, but did not confer full membership rights to Brothers.

## A. KPI's inclusion of Brothers on its list of Members is insufficient to demonstrate Brothers's standing.

In Section 18-305 actions, as well as in its corporate Section 220 and partnership 17-305 analogs,[43] the Court often assesses standing by "rel[ying] on the corporation's existing stock ledger." *Knott Partners L.P. v. Telepathy Labs, Inc.*, 2021 WL 5493092, at *4 (Del. Ch. Nov. 23, 2021). The ledger functions as *prima facie* evidence that the member is a "holder of record." *Pogue v. Hybrid Energy, Inc.*, 2016 WL 4154253, at *3 (Del. Ch. July 7, 2016) (assessing standing in the Section 220 context). Even though the ledger is *prima facie* evidence of membership, the Court may consider evidence beyond the ledger where "the *prima facie* case is rebutted by other evidence." *See Gill*, 2023 WL 4607070, at *10 (citing *Pogue*, 2016 WL 4154253, at *3). While Section 220 cases long used the stock

---

[43] Because Sections 18-305 and 17-305 are based on Section 220, "Delaware courts have interpreted Section 18-305 by looking to cases interpreting similar Delaware statutes concerning corporations and partnerships, such as Section 220 . . . ." *Gill*, 2023 WL 4607070, at *10 n.66 (citing *Riker v. Teucrium Trading, LLC*, 2020 WL 2393340, at *4 (Del. Ch. May 12, 2020), *judgment entered*, (Del. Ch. 2020) (internal citations omitted)).

11

ledger as the sole means of assessing standing, this Court departed from such rigidity in the LLC context, recognizing that "LLCs generally are created on a less formal basis than corporations and are basically creatures of contract." *Mickman v. American International Processing, L.L.C.*, 2009 WL 891807, at *2 (Del. Ch. 2009).[44] In the few cases where the Court has inquired beyond the ledger to assess standing, the Court has adopted a narrow view, resolving the case on "factual admissions or contract interpretation." *Gill*, 2023 WL 4607070, at *10; *see Prokupek v. Consumer Capital Partners LLC*, 2014 WL 7452205, at *3-4 (Del. Ch. Dec. 20, 2014) (employing contract interpretation to assess the plaintiff's lack of standing in a books and records action).

Brothers contends that he is a member of KPI because his name is included on KPI's list of members.[45] The list includes KPH as a "capital interest member," with Mr. Brothers, Mr. Dazo, and Mr. Sci also named.[46] At trial, KPI's counsel

---

[44] In *Mickman*, the Court distinguished Section 18-305 from Section 220 with reference to the Delaware Supreme Court's then-precedential opinion in *Shaw v. Agri-Mark, Inc.* 663 A.2d 464 (Del. 1995), *superseded by statute*, 74 Del. Laws ch. 84, §§ 5-8 (2003), *as recognized in Cent. Laborers Pension Fund v. News Corp.*, 45 A.3d 139, 143-44 (Del. 2012) (discussing the amendment to Section 220(b) extending inspection rights to beneficial owners of stock). The expansion of Section 220 standing does not affect the flexible Section 18-305 inquiry.

[45] JX 13, 148:17-149:10. The parties did not produce the list in their trial exhibits and the only evidence of this list comes from Huang's deposition.

[46] *Id.* at 149:1-3. Dazo and Sci are the two other parties who received a profits interest from KPI. *See id.* at 80:2-9. The parties did not provide a copy of this list in their Joint Exhibits.

contended that the list functioned as a capitalization table.[47] Because Brothers and the other parties stood to receive a financial benefit "in the event of an exit," KPI recorded a list to remain apprised of such rights.[48] Huang further confirmed the capitalization function of this list by noting that he updated Brothers's profits interest from 0.8% to 4% after Brothers's favorable arbitration award.[49]

The capitalization explanation holds water because the practice is internally consistent with how KPH records economic interests in its own entity.[50] KPH's LLC Operating Agreement includes an Appendix C, which lists all parties with economic interests.[51] KPI Investors, LLC holds 750 Preferred Units with a capital contribution of $4.5 million.[52] Atar KPI Investors, LLC holds 250 Common Units with $0 in capital contributions.[53] Huang understood Atar KPI to hold a "profit interest membership interest" in KPH.[54]

---

[47] Trial Tr., 60:15-61:9.

[48] *Id.* at 60:19-21.

[49] JX 13, 149:7-10.

[50] *See* JX 2.

[51] *See id.* at BROTHERS 0688.

[52] *Id.*

[53] *Id.*

[54] JX 13, 21:8-13. Brothers's counsel used the term "profits interest membership interest" in Huang's deposition. Neither Huang nor the KPH Operating Agreement call it such. KPH's Operating Agreement explicitly grants voting rights to holders of "common units," although holders have no capital contribution requirement. *See* JX 2, at BROTHERS 0648. KPI's Operating Agreement, by contrast, neither provides for multiple classes of stock nor discusses voting rights. *See* JX 1.

Atar KPI Investors, LLC also maintains a list of all economically interested parties.[55] The list includes five parties, four of which are profits-interest holders and one is not.[56] One of these parties, BCK Capital, Inc., is controlled by Mr. Huang.[57] Huang testified that his interest is a profits-interest membership, but that he lacks management rights: "I am not the manager. I don't have rights . . . to vote, right. . . . [W]e just share in the profits interest."[58] Atar too lists all parties with an economic interest in the entity, irrespective of management rights.

It is reasonable to conclude that Atar-affiliated entities—Atar, KPH, and KPI—maintain a practice of listing all parties with an economic interest in the entity. The function of the list is not linked to voting or management rights, although they may coincide. Thus, reference to the list alone cannot be dispositive to determine Brothers's membership status for the purpose of Section 18-305 standing. The flexible nature of LLCs recognized by the *Mickman* court is on full display. Different entities maintain different records for various purposes. Brothers's presence on KPI's list is as consistent with contingent economic interest KPI claims

---

[55] JX 3.

[56] *Id.*, at BROTHERS 0642. Huang stated that the Cyrus Nikou Living Trust is not a profits-interest member, as designated by the lack of an asterisk beside its name, unlike the other four profits-interest holders. *See* Huang Dep. Tr., 32:11-15.

[57] JX 3, at BROTHERS 0642. The full listing is "BCK Capital, Inc. c/o Stanley Huang." *Id.*

[58] Huang Dep. Tr. 34:12-15.

he has as it is with a possible membership interest. The Court's inquiry must continue.

Brothers also contends that he is a member because KPI listed him as a member on its 2021 draft LLC agreement. An unsigned draft LLC agreement is insufficient evidence that Brothers is a member. To assess standing, Delaware courts examine the "existing stock ledger" in section 220 cases and by analog, the existing membership list for LLCs. *Knott Partners L.P.*, 2021 WL 5493092, at *4.[59] An unsigned LLC draft agreement cannot provide *prima facie* evidence of membership because the document has no legal effect.

**B. Brothers did not receive a membership interest under the terms of the operating agreement because he made no capital contribution, and the employment agreement does not evidence mutually agreed-upon terms and conditions.**

As Brothers cannot demonstrate his standing as a member by reference to the LLC membership list, the Court next considers the terms of the LLC operating agreement. Under Delaware's contractarian scheme for LLCs, the terms of the

---

[59] Section 220 is strictly construed because it is "in derogation of common law." *Knott*, 2021 WL 5493092, at *4 (citing *Rainbow Nav, Inc. v. Pan Ocean Nv., Inc.*, 535 A.2d 1357, 1359 (Del. 1987). The Supreme Court in *Rainbow Nav* held that the stock ledger requirement cannot be frustrated by "nonfeasance," i.e., failure to accurately maintain the ledger. *Id.* By analogy, overinclusion in a membership list, which appears to be maintained for capitalization purposes, does not expand standing for books and records inspections, because the language of the operating agreement and the default provisions of the LLC Act prevail. Brothers has cited no authority for this capacious conception of standing, and the Court declines to provide such authority here.

15

operating agreement normally dictate membership terms and its corresponding rights.

All considerations of an LLC's internal governance commence by examining the LLC agreement. *See In re Coinmint, LLC*, 261 A.3d 867, 900 (Del. Ch. 2021). Because LLCs are "creatures of contract," the policy of the Delaware LLC Act gives "maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." 6 *Del. C.* § 18-1101(b); *see Holifield v. XRI Investment Holdings LLC*, 304 A.3d 896, 922 (Del. 2023). The gap-filling measures of the Delaware LLC act apply where the LLC agreement is ambiguous or silent on the governance issue. *Godden v. Franco*, 2018 WL 3998431, at *7 (Del. Ch. Aug. 21, 2018).

The Court will analyze the LLC Operating Agreement chronologically, beginning with KPH's creation of the profits interest pool. KPI admits that the profits incentive pool comprises interests transferred from KPH into the pool.[60] The operating agreement contains provisions governing the transfer of interests and admission of additional members to the LLC.[61] No other provision of the operating

---

[60] *See* Huang Dep. Tr., 68:6-11. Huang stated that KPH "tried to" transfer this interest, but that the transfer lacked "formal documentation. *Id.*, at 68:10-11. Under KPH's theory, the two amended operating agreements that Brothers declined to sign would have formalized the interest transfer. *See id.*, at 70:10-13. Under the 2021 proposed Amended Agreement, Brothers would have become a member with both inspection and management rights. *See* JX 8, at 16, 31.

[61] JX 1, at 8-9.

16

agreement discusses membership interests or classes of members. Section 13.1

provides:

> The Member's Membership Interest is transferable either voluntarily or by operation of law. The Member may Dispose of all or a portion of the Member's Membership Interest. In the event of the Transfer of less than all of the Member's Membership Interest, the transferee shall be Admitted on such terms and conditions upon which the Member and the transferee may agree. In the event of the Transfer of the Member's entire Membership Interest, the transferee shall succeed to all the Member's rights under this LLC Agreement and shall be Admitted upon the effectiveness of such Transfer.[62]

Further, section 13.2 of the Operating Agreement permits admission of additional

members: "The Company may, to the extent and on the terms and conditions

determined by the Member, Admit Additional Members and determine the Capital

Contributions, rights and duties of such Additional Member."[63]

When read together, the relevant provisions of the operating agreement

contemplate that (1) one class of membership shares exist; (2) members may transfer

their membership shares in or whole or in part; (3) the transferee will be admitted to

the membership upon mutually agreed upon terms and conditions; and (4) a member

will make a capital contribution into the LLC.[64]

---

[62] *Id.* at 9.

[63] *Id.*

[64] Article X, section 10.1 of the Operating Agreement provides the scope of the initial capital contribution: "The Member will make an initial Capital Contribution of $100.00." JX 1, at 8. While section 13.2 states that the member may determine the capital contributions of new members, the two sections read together contemplate that a new

17

Neither party disputes that KPH transferred an interest to Brothers.[65] The dispositive question concerns which rights accompanied the transfer. Brothers contends that when KPH transferred Brothers a profits interest, it was "*required* to [a]dmit Mr. Brothers" upon the terms and conditions to which both parties agreed.[66] Under this theory, the transfer of the profits interest rendered Brothers a full member, with full management and economic rights excepting those explicitly excluded in the terms and conditions.[67] In contrast, KPI argues the profits-interest transfer granted Brothers "contingent economic rights to share in the profits upon a liquidity event, nothing more."[68] In Brothers's view, the profits interest represented a full transfer of rights, with the exception that Brothers's economic rights were contingent to a vesting period.[69]

---

member will make a capital contribution, although the value is subject to modification. *Id.* at 8-9.

[65] *See* Pl.'s Reply Pre-Trial Brief, D.I. 68, at 5 ("[W]hile the parties dispute the extent of the rights transferred, Defendant concedes that KPH did in fact **Transfer** to Mr. Brothers a portion of its Membership Interest pursuant to the Operating Agreement.") (emphasis in original); Def.'s Answering Pre-Trial Brief, at 28 ("The crux of the dispute here is: what rights accompanied the *transfer* of a profits interest?") (emphasis added).

[66] Pl.'s Reply Pre-Trial Brief, at 4 (emphasis in original).

[67] Under Brothers's theory, this is why Brothers is a full member without the duty to make a capital contribution. The agreement tailored Brothers's economic rights (contingent profits interest), but no such limit existed for the management rights. Brothers contends that a party receives all rights except those specifically delimited.

[68] Def.'s Answering Pre-Trial Brief, at 28.

[69] *See* Tr. 7:15-19 ("Because what KPH did was transfer the membership interest that they had.").

18

KPH was the sole member of KPI when Brothers was hired. Under the LLC Agreement, one type of membership existed.[70] KPH could transfer shares in whole or part. That does not mean a mere percentage of the LLC. It could include, as here, only a portion of the rights carved from the membership. KPH could transfer a financial-only portion of the rights.[71] The terms and conditions of any transfer of membership are determined by the member, KPH.[72] KPH only transferred the profits interest, a financial-only interest, to Brothers through the employment agreement. The assignment failed to meet the mutually agreed upon terms and conditions requirement.

Put otherwise, Brothers theorizes that he presumptively receives all rights except those specifically stipulated. But Brothers's understanding does not comport with the terms of the Operating Agreement itself. While the Operating Agreement provided for one class of membership, the agreement also imposed conditions to the admission of new members. Two requirements were not met in KPI's transfer of a

---

[70] *See* JX 16.

[71] Unless otherwise provided in the LLC agreement, members may freely transfer or assign economic rights of membership, whereas members need express consent to transfer or assign managerial powers and duties. *See Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A.3d 738, 760 (Del. Ch. 2004) (recognizing Delaware's policy preference to rather tolerate "a new passive co-investor . . . than to endure a new co-manager without consent). Delaware codified this policy in 6 *Del. C.* §§ 18-702(b)(3), 18-304.

"Membership Interest," under KPI's Operating Agreement, represents the entire interest "including such Member's economic interest, management rights and such other rights and privileges that the Member may enjoy by being a Member." JX 1, at 3.

profits interest to Brothers: (1) mutually agreed-upon terms and conditions and (2) the capital contribution. As a result, Brothers is not a full member with management rights. The Court next addresses each of these conditions in turn.

### 1. KPI's Employment Offer does not constitute mutually agreed-upon terms and conditions for a new member.

Section 13.1 of KPI's Operating Agreement mandates admission of a new member upon "transfer of less than all of the Member's Membership Interest . . . on such terms and conditions upon which the Member and the transferee may agree." Brothers has relied on KPI's employment offer and the email discussion between Brothers and Brown as the written record of such terms and conditions.[73]

When interpreting a contract, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. American Legacy Foundation.*, 903 A.2d 728, 739 (Del. 2006). The Court assesses a reasonable reading of the contract by reading it "in full and situated in the commercial context between the parties." *Chicago Bridge & Iron Co. N.V. v. Westinghouse Electric Co. LLC*, 166 A.3d 912, 926-7 (Del. 2017). Such commercial context cannot override the plain language of the agreement. *See Florida Chemical Co., LLC v. Floket Industries Inc.*, 262 A.3d 1066, 1080 (Del. Ch.

---

[73] *See* Pl.'s Opening Pre-Trial Brief, at 13 ("Here, the agreed upon 'terms and conditions' appear in the Employment Agreement and the February 2020 emails. . . . Those documents show that KPH and Mr. Brothers agreed to limit his economic rights . . . ." (internal quotations omitted).

2021) (citing *Town of Cheswold v. Central Delaware Business Park*, 188 A.3d 810, 820 (Del. 2018)).

The Employment Agreement and emails show no discussion of Brothers's purported full membership interest. Instead, the materials that Brothers relies on reflect his interest in economic rights and KPI's articulation of Brothers's position as CEO.

The Employment Offer constitutes a contract offer describing Brothers's responsibilities and rights as CEO of KPI, nothing more. The offer first describes Brothers's right to observe all Board of Managers meetings and to access all documentation provided to the Board of Managers. Next, the offer detailed Brothers's salary and signing bonus. The letter further described an additional bonus structure, the Management Incentive Plan, which compensated Brothers if KPI met certain EBITDA benchmarks under his management. Critically, the letter's description of Brothers's profits interest directly follows the previous discussion of financial compensation. The letter clarifies that the pool was reserved for "the Company's senior leadership team," with 4% going to Brothers (subject to a vesting schedule) and 1% to be apportioned among other senior executives at Brothers's discretion. The pool structure is not corroborative of a full membership interest. It would be incongruous with the member approval of transfers in the LLC agreement to allow Brothers to deploy 1% of full membership rights to his leadership team of

21

unspecified identity. The pool structure and Brothers' flexibility to assign his profits interest is consistent with a financial interest, not a full membership interest.

The letter concludes by discussing other practicalities surrounding Brothers's employment: vacation time, place of work, indemnification, and rights to termination. The offer letter focuses on matters pertinent to Brothers's employment as CEO. The letter never uses the term "member" or "membership" and includes rights restrictions that do not apply to members under the terms of the Operating Agreement.[74] The offer letter also fails to give Brothers any of the indicia of full membership: capital contributions, management rights, voting, and the ability to inspect books and records, except as a board observer.

Brothers attempts to explain the explicit restrictions in the offer letter by distinguishing between his rights as a CEO and his rights as a member. This theory relies on the principle that Brothers simultaneously held two positions, CEO and member, each with corresponding rights.[75] The Employment Offer primarily spelled out Brothers's rights as CEO, such as "access to all documentation and other information provided to the Board of Managers" and attendance to "all meetings of

---

[74] For example, Section 9.1 of the operating agreement gives the manager the right to determine "all decisions concerning the business affairs of the Company . . . ." JX 1, at 6. The operating agreement makes the member the default manager in lieu of an appointment. *See id.* (Article VIII). The Employment Offer states that Brothers can observe (but not vote) at Board of Directors meetings. JX 5.

[75] *See* Tr. 9:10-11 ("And so [Brothers], like so many owner executives, wears multiple hats.").

the Board of Managers . . . in an observer capacity."[76] Under this theory, Brothers has a distinct bundle of rights as a member, including the right to vote and the right to access the books and records.[77]

Unfortunately, Brothers's interpretation relies on silence. Under Brothers's theory, the Employment Offer was explicit on his rights and responsibilities as CEO, but completely devoid of membership detail. The offer cannot be reasonably read to convey Brothers's claimed bundle of management rights. Even considering the extrinsic evidence of Brothers's conversation with the recruiter about the Employment Agreement does not bolster his argument.

Nor does the Court find plausible that KPH agreed on membership terms with Brothers via documents that expressly convey no such intent. The plain language of the Employment Agreement does not support Brothers's interpretation that KPI expressly limited his rights as CEO, while silently conveying those same rights in Brothers's capacity as member.

Brothers's subjective understanding of his profits interest does not support the conclusion that he holds a membership interest in KPI.[78] Brothers's primary interest

---

[76] JX 5, at 1; *see* Tr. 7:4-7 ("[T]he language . . . in the employment agreement speaks to [Brothers's] role as CEO as *ex officio* status as an observer.").

[77] *See* Tr. 7:8-12 ("[Brothers's] actual membership interest and his rights that flow therefrom are not delineated in the employment agreement at all, and in fact only arise subsequently once his interest was allocated to him and then vested.").

[78] As Defendant notes in its pre-trial brief, Delaware adheres to the objective theory of contracts, so one party's subjective understanding cannot control. *See Leaf Invenergy Co.*

was in compensation comparable to what he expected to receive at Forrester Research. In his email correspondence with Brown, Brothers understood that the "'profits incentive pool' is the substitute for equity."[79] Brown ends the email chain by writing, "[t]hanks for your quick turnaround - answers to your financial questions follow below."[80] Brothers's focus was the financial import. Brothers's perspective shifted by the time of his deposition when he articulated his conception of the standard rights of an equity holder in an LLC to include "the rights to access books and records of the firm . . . [and] the rights to vote on certain matters."[81] Brothers admitted that when he considered his profits interest, he did not think about his voting rights and set forth no understanding of his expected equity rights.[82] But KPI insisted from the outset that Brothers received neither of these rights. After receiving the Employment Offer from KPI, Brothers sought clarification about the profits-incentive pool, presuming that it was a "substitute for equity."[83] KPI's agent, Gustav

---

*v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) ("When we interpret contracts, our task is to fulfill the 'parties' shared expectations at the time they contracted.' '[B]ut because Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party.'" (quoting *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017)).

[79] JX 4, at 2.

[80] *Id.* at 1.

[81] Brothers Dep., 35:7-15.

[82] *Id.* 35:3-16.

[83] JX 4, at 2.

Brown, clarified that it was a "form of equity ownership" traditional in LLCs and proceeded to discuss the economics of the arrangement.[84] While Brown used imprecise language, analogizing the profits interest to "shares . . . in a C-Corporation" and a "form of 'membership interests,'" Brown constrained his description to economic, not management rights.[85] Following the email exchange, Brothers signed the Employment Agreement.

The Employment Offer represented a binding contract between Brothers and KPI concerning Brothers's position as CEO. The contractual language detailed Brothers's rights and responsibilities. The Offer never speaks to Brothers's role, rights, or responsibilities as member. The Offer therefore does not constitute mutually agreed upon terms and conditions precedent to Brothers becoming a member. Because the parties failed to meet the terms and conditions requirement, Brothers could not have received a full membership interest as contemplated under the terms of the Operating Agreement. Brothers's argument that he is a member of KPI fails in this regard.

### 2. Brothers never made a capital contribution, as required of members under Article X and section 13.2 of KPI's operating agreement.

---

[84] *Id.*

[85] *Id.* Inconsistent and casual use of "member" and "membership interest" plagued KPI throughout the controversy. Huang testified that he did not always use these terms to mean a technical "Membership Interest" in KPI LLC. *See, e.g.*, JX 13, 155:21-156:11. But mere confusion does not a member make.

Putting aside the absence of mutually agreed-upon terms and conditions between Brothers and KPI, the disclaimer of Brothers's obligation to make a capital contribution by both parties establishes that KPI never intended nor effectuated Brothers's receipt of a membership interest, and Brothers never accepted the responsibilities of full membership.

The Operating Agreement too is a contract. As such, "[it] must be construed, where possible, so that all of its provisions may be read together and harmonized." *Cerberus International Ltd. v. Apollo Management, L.P.*, 1999 WL 33236239, at *4 (Del. Ch. Nov. 4, 1999). A reasonable interpretation requires internal consistency and full effect to the constitutive provisions. *See id.*

As addressed above, Article X governs capital contributions.[86] Section 10.1 mandates an initial Capital Contribution by the member.[87] Section 10.2 prescribes the possibility of future, non-mandatory capital contributions.[88] Section 13.2 contemplates a determination of "the Capital Contributions, rights and duties of such Additional Member."[89] Capital Contribution is a defined term, meaning "cash, cash equivalents or the agreed fair market value of Property which a Member contributes

---

[86] JX 1, at 8.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 9.

to the Company . . . ."[90]   Capital Contribution does not include services as a permissible contribution.

Brothers understood that KPI never required him to make a capital contribution.  He neither made a capital contribution nor participated in subsequent capital calls.[91]  After KPI terminated Brothers, Stanley Huang spoke with him on the phone to discuss the future of Brothers's profits interest.[92]  Again, the conversation centered on the economic consequences of the profits interest, distinguishing it from the capital interest that had a preferred rate of return.[93]  Huang clarified that the "capital interest" holder is subject to a capital call, but the profits interest holder is not.[94]  Huang's statements confirm that Brothers could not be a full member as contemplated under the Operating Agreement.  Brothers did not make a capital contribution nor was he subject to a capital call pursuant to his vested profits equity interest.[95]

---

[90] *Id.* at 2.

[91] *See* Brothers Dep., 83:1-7.

[92] *See id.* 40:9-17.

[93] *Id.* at 41: 6-11.  Huang used the term "capital membership" and "ordinary membership" to distinguish the two types of interest.  Huang, like Gustav Brown, used the term "membership" loosely.  Huang clarified in his deposition that the term "profits membership" does not refer to full "ownership."  *See* Huang Dep., 34:11-18.

[94] JX 6, at BROTHERS 0088.  This exhibit reflects Brothers's handwritten notes from calls with different members of Atar KPI Investors.

[95] *See* JX 6, at BROTHERS 0089 ("I am not subject to a capital call.").

### 3. KPI did not breach the requirement of its operating agreement by not making Brothers a member.

Brothers contends that KPI had to make him a member following transfer of less than all of its membership interest. Seeking to strictly construe Section 13.1 of KPI's operating agreement, Brothers focuses on the following language: "In the event of the Transfer of less than all of the Member's Membership Interest, the transferee *shall* be Admitted on such terms and conditions . . . ."[96] Brothers reasons that KPH transferred less than all of its 100% membership interest. So, Brothers must be admitted. Shall, after all, conveys that the action is mandatory. *See Zurich America Insurance Co. v. St. Paul Surplus Lines, Inc.*, 2009 WL 4895120, at *7 n.55 (Del. Ch. Dec. 10, 2009), as revised (Apr. 14, 2010) (citing *Stockman v. Heartland Industrial Partners, L.P.*, 2009 WL 2096213, at *6 (Del. Ch. July 14, 2009)). But Brothers overreads the term "Transfer" in the Operating Agreement.

> Article I of the Operating Agreement includes transfer as a defined term:
>
> Any sale, assignment, conveyance, exchange or other absolute transfer (including dispositions by operation of law), but not including any mortgage, pledge, grant, hypothecation as security or encumbrance, except with respect to an absolute transfer in payment or by way of foreclosure of the obligation secured by such mortgage, pledge, grant hypothecation or other security or encumbrance.[97]

---

[96] JX 1, at 8-9 (emphasis added).

[97] *Id.* at 3.

The agreement too defines "Dispose," which is broader than a "Transfer" and contemplates something less than a full transfer: "Any transfer or any mortgage, pledge, grant, hypothecation of other transfer as security or encumbrance."[98] The agreement contemplates either a full assignment of the membership interest, "a Transfer," or something less, "Disposition."

Reading the operating agreement as a whole, the mandatory "shall" language of section 13.2 is only triggered by a transfer—a full assignment of membership, which includes economic and management rights. Viewed through this lens, the concert of Defendant's behavior is reasonable. KPI understood itself to assign Brothers contingent economic rights in up to 4% of the entity. KPI never undertook the formalities of mutually agreed-upon terms and conditions nor the economic buy-in of a capital contribution because KPI never intended to make Brothers a member. Although the language of the Operating Agreement is vague, KPI's course of conduct does not violate its binding language.

**B. Because the operating agreement does not provide for the limited assignment of membership rights, the default rules of the Delaware LLC Act govern the transaction.**

The Delaware LLC Act is a "flexible statute" that encourages "private ordering" among the members to govern their relationship. *Elf Atochem North*

---

[98] *Id.* at 2.

*America, Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999) (quoting JAMES D. COX,

THOMAS LEE HAZEN & FOREST HODGE O'NEAL, CORPORATIONS § 1.12 (1999)).

Based on the Delaware Revised Uniform Limited Partnership Act (DRULPA), both

statutes provide "default rules . . . [that] cover a variety of potential omissions in the

limited liability company agreement." *Achain, Inc. v. Leemon Family LLC*, 25 A.3d

800, 803 n.10 (Del. Ch. 2011) (quoting ROBERT L. SYMONDS, JR. & MATTHEW J.

O'TOOLE, SYMONDS & O'TOOLE ON DELAWARE LIMITED LIABILITY COMPANIES §

1.03[A][2] (2007)). The language of the LLC Act unambiguously reflects this intent

by often including within the statutory text, "except as provided in a limited liability

company agreement." *Achain, Inc.*, 25 A.3d at 803 (Del. Ch. 2011) (citing 6 *Del. C.*

§ 18-702(a), (b)(2) (2010)).[99]

The Delaware LLC Act in Section 18-702(a) provides the default rule for

assignment of interests:

> A limited liability company interest is assignable in whole or in part
> except as provided in a limited liability company agreement. The
> assignee of a member's limited liability company interest shall have no
> right to participate in the management of the business and affairs of a
> limited liability company except as provided in a limited liability
> company agreement or, unless otherwise provided in the limited
> liability company agreement, upon the vote or consent of all of the
> members of the limited liability company.

---

[99] Although the Delaware Legislature amended the statute in 2016, the "except as provided"
language is unchanged. *See* 80 Del. Laws ch. 271 (2016).

Under the statute's terms, the assignment of a membership interest is by default only an economic assignment with no accompanying management rights. *See Achain, Inc.*, 25 A.3d at 804-05.

In *In re Carlisle Etcetera LLC*, an assignee of a membership interest petitioned for dissolution. 114 A.3d 592 (Del. Ch. 2015). Under the LLC Act, only members can petition for dissolution and under Sections 18-702(a)-(b), an assignee of a membership interest is not "entitle[d] . . . to exercise any rights or powers of a member." *Id.* (citing the statute). There, the assignee contended that it became a *de facto* member by consent of the parties, arguing that "tax forms and [the] draft agreement that identified [assignee] as a member were records of the company." *Id.* (analyzing Section 18-301(b)(1) of the LLC Act).[100] The *Carlisle* court rejected the assignee's argument by applying Section 18-704(a), which permits an assignee to become a member:

(1) As provided in the limited liability company agreement; or

---

[100] As in *Carlisle*, the parties here have raised arguments based on the tax records. While tax records are not dispositive—classification for federal tax purposes does not control Delaware business entity law—Brothers presents weaker evidence than the petitioner in *Carlisle*, who had entity tax forms referring to his membership. Despite claiming a full membership interest, Brothers never received a K-1 from KPI. Brothers Dep. 89:19-22. Brothers had, however, received K-1s from other LLCs in which he was a member. *Id.*, 90:5-7. KPI filed no tax forms because it had a single member, KPH, which claimed all KPI's gains and losses on a pass-through basis. JX 13, 160:20-21.

(2) Unless otherwise provided in the limited liability company agreement, upon the affirmative vote or written consent of all of the members of the limited liability company.[101]

*Id.* at 599. Because the *Carlisle* LLC agreement did not speak to assignment, the Court applied the default rules under the Delaware LLC Act.

KPI's assignment of a profits interest to Brothers is a transaction not contemplated under the terms of the Operating Agreement.[102] Because the Operating Agreement does not speak to the consequences of assigning an economic interest to a third party without discussion of accompanying management rights, this Court turns to the Delaware LLC Act to fill in the gaps.

---

[101] 77 Del. Laws, ch. 287, § 24 (2010). The Delaware Legislature amended Section 18-704 in 2016, the year following the *Carlisle* decision. The 2016 amendment added 18-704(a)(3):

> Unless otherwise provided in the limited liability company agreement by a specific reference to this subsection or otherwise provided in connection with the assignment, upon the voluntary assignment by the sole member of the limited liability company of all of the limited liability company interests in the limited liability company to a single assignee. An assignment will be voluntary for purposes of this subsection if it is consented to by the member at the time of the assignment and is not effected by foreclosure or other similar legal process.

80 Del. Laws, ch. 271, § 8 (2016). Because the transaction at issue here does not concern the voluntary assignment of all of KPI's interests, the applicability of the *Carlisle* analysis to the present facts is unchanged.

[102] The Court recognizes that this whole litigation may have been avoided had KPI amended its operating agreement prior to or during Brothers's tenure as CEO. *See* Huang Dep. Tr. 86:10-24 (stating KPI's intentions to amend the agreement, which was delayed because of KPI's recent acquisition and the COVID pandemic).

As in *Carlisle*, KPI's LLC operating agreement lacks any provision describing how an assignee with limited economic interests may become a full member. There has also been no affirmative vote or written consent of KPI's members to admit Brothers as a member. *Carlisle* applied Section 18-302(d) of the LLC act to interpret "affirmative vote or written consent," noting that the phrase "appears rarely in the LLC Act" and all such appearances "involve similar occasions for formal member action." While KPI did not appear to hold regular votes, no evidence presented to this Court indicates formal member action to admit Brothers as a member.

Applying the default provisions of the LLC Act, KPI's transfer of a profits interest to Brothers constituted an assignment of economic rights, and not a full membership transfer. Because Brothers is not a member, he lacks standing to compel inspection of KPI's books and records.

### C. The bad faith exception to the American Rule does not apply. KPI is awarded costs under Court of Chancery Rule 54(d).

Brothers argues that KPI should pay his legal fees and costs because of its "persistent bad-faith efforts to thwart . . . [his] access to the Records and various misrepresentations to the Court . . . ."[103] Having held that Brothers lacks standing to compel inspection for books and records, the Court rejects Brothers's request for inspection costs and fee shifting.

---

[103] Pl.'s Opening Pre-Trial Brief, at 24.

Delaware courts follow the American Rule, where the prevailing party ordinarily pays its own fees and costs. *Haywood v. Ambase Corp.*, 2005 WL 2130614, at *8 (Del. Ch. Aug. 22, 2005) (citing *Montgomery Cellular Holding. Co. v. Dobler*, 2005 WL 1936157, at *15 (Del. Aug. 1, 2005)). The American Rule admits an exception in cases where a party engaged in bad faith conduct, such as unnecessarily prolonging litigation or "knowingly assert[ing] frivolous claims." *Nagy v. Bistricer*, 770 A.2d 43, 64-5 (Del. Ch. 2000) (citing *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)). Invoking the bad faith exception is exceedingly rare, and this Court will only invoke it to "deter abusive litigation and to protect the integrity of the judicial process. *Montgomery Cellular*, 2005 WL 1936157, at *15; *see Johnston*, 720 A.3d 542 (applying the exception where defendants delayed litigation, brought frivolous motions, and falsified evidence). Court of Chancery Rule 54(d) awards costs "as of course to the prevailing party unless the Court otherwise directs." The presence of "close and complex" issues does not change the award under 54(d). *See Adams v. Calvarese Farms Maintenance Corp.*, 2011 WL 383862, at *5 (Del. Ch. Jan. 13, 2011).

The facts of this action do not support application of the bad faith exception. First, KPI's success in challenging Brothers's standing vindicates its behavior in denying Brothers access to the records. Although Brothers contests KPI's insistence that he could only view the books and records in Santa Barbara, KPI had no duty to

34

provide him the records at all, much less in a more convenient location. KPI's conduct does not resemble the actions proscribed in *Montgomery Cellular*: KPI provided meritorious defenses, presented relevant motions, and relied on credible evidence. KPI's behavior does not show bad faith.

KPI is the prevailing party on the merits. It successfully argued that Brothers lacked standing to compel inspection of KPI's books and records. As such, KPI is entitled to recover its costs. Each party bears its own expenses, including attorneys' fees.

## III.    CONCLUSION

For these reasons, Plaintiff lacks standing to compel inspection of KPI's books and records and his complaint should be dismissed. The parties shall meet and confer about shifting costs to Brothers. If the parties cannot agree, they may submit competing proposals. The Court will not delay the time for exceptions pending a decision on costs. The Court designates this a final report, and exceptions may be filed under the expedited schedule in Court of Chancery Rule 144(d)(2).